IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STERLING OWENS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-CV-02185 |
| | ) | |
| UNIFIED GOVERNMENT OF | ) | |
| WYANDOTTE COUNTY/KANSAS | ) | |
| CITY, KANSAS | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT KANSAS CITY BOARD OF PUBLIC UTILITIES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("Defendant"),[1] and provides the following Memorandum in Support of its Motion for Summary Judgment:

## I.   NATURE OF THE MATTER BEFORE THE COURT

Plaintiff is a lineman for the Kansas City Board of Public Utilities ("the BPU"), which has a requirement that employees maintain a primary residence within Wyandotte County. Plaintiff was investigated for a potential violation of BPU's residency requirement, related to a large home he was building outside the residency area. Plaintiff's investigation took place over the course of a year, during which time he was not suspended and instead worked regularly. The investigation did not find he had violated the residency policy and he accordingly was never disciplined. Plaintiff filed this suit under 42 U.S.C. §1981, alleging that the investigation constituted harassment and was racially discriminatory. Because Plaintiff cannot state *prima facie* cases of

---

[1] As discussed in the Pretrial Order, while the Unified Government of Wyandotte County/Kansas City, Kansas is the named defendant in this case, the BPU is an administrative agency of the Unified Government and does not have the capacity to sue or be sued. The Court directed the Clerk to dismiss the BPU from this case.

harassment, discrimination, or retaliation, Defendant is entitled to summary judgment. Alternatively, if Plaintiff can state *prima facie* cases of either discrimination or retaliation, Defendant has legitimate, non-discriminatory reasons for any adverse employment action.

## II. STATEMENT OF UNCONTROVERTED FACTS

Pursuant to D. KAN. R. 56.1, Defendant states that the following facts are uncontroverted based upon the pleadings, discovery responses and affidavits[2]:

1. Plaintiff was hired at BPU in 2013 as a lineman, and has been a lineman since approximately 2007. Ex. A, 7:13-23.

2. Plaintiff is married and has four children. Ex. A, 8:19-20.

### A. BPU's Residency Requirement

3. Plaintiff acknowledged that the BPU employee handbook contains a residency requirement, but admitted that he has never read the residency requirement for the BPU. Ex. A, 29:3-5; Ex B, p. BPU000011-13.

4. Plaintiff added, "I didn't feel like I had to" read the residency requirement. Ex. A, 33: 20-24.

5. Plaintiff testified that he had, to the day of his deposition, never read the policy. Ex. A, 35:4-8.

6. The BPU residency requirement states that "all BPU employees shall establish and maintain their legal primary residence within the legally defined boundaries of the Unified Government of Wyandotte County/Kansas City, Kansas, throughout the period of their

---

[2]      These facts are admitted solely for purposes of summary judgment and should not be deemed admissions for purposes of trial. *Wright, Miller & Kane, Fed. Prac. & Proc.* ' 2722 at 48.

employment qualification, and shall not attempt to circumvent the objectives of the BPU's employee residency requirement." Ex A, 39:20-40:4; Ex B, BPU000011.

7.   The residency requirement provides, "[a]ll BPU employees shall have a period of twelve (12) months after employment begins to establish and maintain a legal primary residence within the legally defined boundaries of the Unified Government of Wyandotte County/Kansas City, Kansas." Ex B, p. BPU000012.

8.   The residency requirement provides: "[a]ll BPU employees found to be in violation of the BPU's residency requirement shall be immediately terminated from employment by the General Manager and shall not be entitled to further compensation or benefits." Ex B, p. BPU000012.

9.   The residency requirement defines legal and primary residence as:

> Legal and primary residence is defined as a BPU employee's domicile, which is the residence that is intended to be permanent rather than temporary and which is the place that is permitted and authorized as a residential dwelling by the laws and ordinances of the State of Kansas and the Unified Government of Wyandotte County/Kansas City, Kansas.   The legal and primary residence shall be the residence where the employee spends the majority of his/her non-work hours.   Tests for determining a BPU employee's legal primary residence include, but are not limited to the residential address of the employee's driver's license, automobile registration, voter's registration, bank accounts, credit cards and legal documents; the address provided for the purpose of school enrollment for children living with the BPU employee; the address provided on the Certificate of Residency filed with the BPU's Human Resources Division; and any other credible evidence indicating the employee's intent to reside at a permanent and primary residence.

> Ex. B, BPU000012-13.

10. BPU employees must file with Human Resources a Certificate of Residency indicating their legal primary residence, and must file additional Certificates of Residency if their legal primary residence changes during employment. Ex B, p. BPU000012.

11. Plaintiff acknowledged providing a Certificate of Residency providing an address of 3211 Kimball, Kansas City, Kansas (hereinafter the "Kimball property") to Defendant on September 21, 2016. Ex. A, 30:15-31:4.

12. The Certificate of Residency acknowledges that the employee has read or is otherwise familiar with the residency requirement. Ex. A, 31:5-18; Ex. C, BPU000311.

13. Plaintiff acknowledged that while he has not read the residency requirement, he has always been familiar with it. Ex. A, 31:14-18.

14. Employees signing the Certificate of Residency acknowledge their understanding that BPU "will actively investigate residency policy complaints and I will be immediately terminated from employment if found to be in violation of the employee residency requirement." Ex. D.

15. Plaintiff acknowledged this portion of the Certificate of Residency. Ex. A, 31:19-25.

16. Plaintiff acknowledged that he does not sleep at the Kimball residence every night, and that he sleeps at another house, 17176 Stillwell Road, Bonner Springs, Kansas (hereinafter the "Stillwell property") on off days. Ex. A, 21:15-19, 24:17-25.

17. Plaintiff understood the residency requirement to require that the "majority of my time spent off work hours was at the 3211 Kimball" property. Ex. A, 32:7-9.

18. Dumovich testified that in considering where the majority of off-work hours are spent, his interpretation as Human Resources Director is where an employee sleeps the majority of the time. Ex. C, 18:3-24.

19. Dumovich explained that BPU would not consider, or hold against an employee, the fact that an employee spends non-work hours outside the residency area for things like family time or going out to dinner. Ex. C, 18:3-24.

20. Because Plaintiff had not read the employee handbook's residency requirement, he testified that this understanding was "just always what I've heard." Ex. A, 32:17-33:1.

21. When asked where he lives.  Plaintiff characterized the Kimball residence as his "legal residence." Ex. A, 24:6-9.

**B. Plaintiff's Properties**

22. During the BPU's residency investigation the BPU discovered through the Wyandotte County Appraiser that Plaintiff owns twelve properties in Wyandotte County. Ex. A, 55:22-56:2; Ex. E, p. BPU000159.

23. Plaintiff rents out eleven of these properties – all but the Kimball property. Ex. A, 55:22-56:2.

24. The Kimball property is appraised at the lowest value of Plaintiff's twelve Wyandotte Properties - $11,203.00. Ex. A, 56:14-17; Ex. E, p. BPU000159.

25. The Kimball property is the smallest of Plaintiff's properties. Ex. A, 56:23-24.

26. The Kimball property has two bedrooms, one bathroom, a kitchen, a living room, and an unfinished basement. Ex. A, 56:25-57:9.

27. Plaintiff's children have never lived at the Kimball property long enough to be enrolled in the Kansas City, Kansas public school system. Ex. A, 57:17-22.

28. Plaintiff's wife has never lived at the Kimball Property. Ex. A, 57:24-58:1.

29. In addition to the twelve Wyandotte County properties, Plaintiff owns the Stillwell property, on which he built a house in 2016. Ex. A, 51:12-52:16.

30. The Stillwell property consists of just under six acres of land and the residence on that property is approximately 2,100 square feet. Ex. A, 53:15-17, 73:17-18.

31. The Stillwell property has garage capacity for six vehicles. Ex. A, 73:19-21.

32. Plaintiff agreed that the value of the Stillwell property is almost half a million dollars. Ex. A, 73:13-16.

33. Three of Plaintiff's children currently live at the Stillwell property. Ex. A, 51:12-16.

34. Going back to 2016, at least two of Plaintiff's children have always resided at the Stillwell property. Ex. A, 51:12-52:3.

35. Plaintiff runs a side business, Owens Electric, out of the Stillwell property. Ex. A, 81:3-8.

**C. Investigation into Plaintiff's Residency**

36. As is the case with other residency investigations under Dumovich, Plaintiff's investigation began with a complaint that Plaintiff was violating the residency requirement. Ex. C, 27:17-28:20.

37. Dumovich was not aware who complained that Plaintiff was violating BPU's residency requirement. Ex. C, 28, 11-14.

38. Every complaint regarding residency is investigated by BPU. Ex. C, 29:23-30:8.

39. Dumovich testified that BPU does investigate potential residency violations based on anonymous complaints. Ex. C, 28:4-6.

40. When a residency complaint is received by BPU, the compliance coordinator conducts the residency evaluation. Ex. C, 29:5-14.

41. At the time of Plaintiff's investigation, BPU's compliance coordinator was Tammy Torrez. Ex. C, 29:15-17.

42. However, the ultimate decision as to whether the residency requirement has been violated is made by the Director of Human Resources. Ex. C, 55:13-18.

43. Throughout Dumovich's tenure as Director of Human Resources, BPU investigates every complaint alleging a residency violation. Ex. C, 29:23-30:8.

44. In July 2019, BPU ran a background check on Plaintiff to determine potential addresses. Ex. C, 39:16-40:8.

45. On August 21, 2019, Torrez contacted Chance Baker of Chief Investigations to conduct surveillance of Plaintiff. Ex. C, 35:24-36:10; Ex. F, BPU000335-336.

46. Mr. Baker surveilled Plaintiff eleven times in 2019: August 30, September 2, September 3, September 6, September 7, September 9, September 10, September 11, September 12, September 13, and September 14. Ex. G, BPU000348-353.

47. Baker concluded that, based on his surveillance, Plaintiff was living at the Stillwell property and using the Kimball property as a work office rather than a residence. Ex. G, BPU000366.

48. In his surveillance, Baker observed the van Plaintiff drove at the Stillwell property ten times, and at the Kimball property only twice. Ex. G, BPU000348-366.

49. A meeting was held on November 4, 2019 between Plaintiff, Dumovich, Torrez, and Plaintiff's union representative Allen Dixon. Ex. C, 56:3-19.

50. Torrez asked Plaintiff if he signed the Certificate of Residency, which he confirmed. Ex. A, 81:21-25.

51. Torrez then showed Plaintiff pictures of the Kimball and Stillwell properties and asked if he owned or lived in each. Ex. A, 81:21-82:5.

52. On December 5, 2019, Torrez authored a 43-page memorandum to Dumovich summarizing her investigation of Plaintiff's residency. Ex. E, BPU000157-199.

53. This memorandum includes a summary of the November 4, 2019 meeting, and Plaintiff agrees with that summary "[p]artly." Ex. A, 82:11-83:3.

54. Plaintiff disputed only Torrez's discussion of his separation from his wife, and that Torrez asked for a timeline of the sale or disposition of the Stillwell property. Ex. A, 83:16-23.

55. Torrez summarized the meeting in her memorandum as follows:

Sterling Owens was brought in for an investigative interview on Monday, November 4, 2019. Allen Dixon, IBEW Business Representative was also present during the investigative interview. During the interview Mr. Owens confirmed he previously resided at 4346 N 122nd St, Kansas City, KS and stated it was actually his wife's house. Mr. Owens confirmed he had submitted the Certificate of Employee Residency forms that were presented to him during the interview. He indicated that he had moved from the 122nd St address to his duplex on Farrow and then from the   duplex on Farrow to the Kimball address. Mr. Owens believed he had submitted a Certificate of Employee Residency form for the address change. However, his personnel file did not reflect this change. The personnel records show Mr. Owens moving from the 122nd St address to Kimball Ave.

During the interview, Mr. Owens was asked if he currently lived at 17176 Stillwell Rd, Bonner Springs, KS. Mr. Owens replied, "1 do not. That 1 am actually building with the intent to either sell, rent or Airbnb. I was actually this morning was putting in a septic." Mr. Owens stated he was not finished with the home and that it was an investment property he has been working on. He indicated he was part of an investment group; three of them JLM, BBC, and Owens Electrical & Investment Group. Mr. Owens indicated he parks his vehicles at the Stillwell address because his van was previously broken into and had police reports to confirm that. In addition, Mr. Owens stated he and his wife had been separated for 3 years and that he had the paperwork to prove it; but that he was currently working on his marriage. Mr. Owens reported, "1 don't even make this house payment my wife makes it;" referring to the home on Stillwell Rd. He also indicated he had an automatic lock on the house on Kimball Ave and cameras, which shows the time he goes in and out every day at that address.

During the interview it was discussed with Mr. Owens whether he needed to make a request for an exception to the residency requirement until he was able to figure out what to do with the property at 17176 Stillwell Rd. He declined and insisted that he lives at the 3211 Kimball Ave address.

At the conclusion of the interview Mr. Owens was asked to provide supporting documentation. Mr. Owens was asked to provide a timeline of the sale or disposition of the Stillwell property, documentation of the keyless entry into the Kimball address, documentation of camera footage at the Kimball address, police reports of vehicles being broken into, and documentation of his legal separation from his wife.

Ex. A, 82:11-83:23; Ex. E, BPU000188-89.

56. During this meeting, Torrez called the Kimball property a "shack." Ex. C, 58:5-9.

57. Dumovich testified that he did not perceive the "shack" comment as racially motivated. Ex. C, 116:19-21

58. Following the meeting BPU requested, and Plaintiff provided, additional documentation that Plaintiff felt verified his residency. Ex. A, 89:16-90:1.

59. Along with the documents, Plaintiff provided a letter summarizing the documentation and supporting his position that he was not violating the residency requirement. Ex. H.

60. At the end of this letter, Plaintiff wrote:

> After more than 45 minutes of answering questions, providing explanations, offering proof, and enduring Human Resource professional, Tammy Torrez's derogatory comment and biases [sic] opinion, I left our November 4 meeting feeling not only offended but also targeted and misunderstood.  A comment of this nature received from a coworker or management staff is something I would have spoken to HR about.

Ex. H.

61. Plaintiff's November 11, 2019 letter does not specifically state that he felt harassed or discriminated against due to his race. Ex A, 136:6-12; Ex. H.

62. Plaintiff gave this letter and documentation to his union representative, who then forwarded it to BPU. Ex A, 133:12-17.

63. Torrez's December 5, 2019 memo concludes that there was sufficient evidence to support the conclusion that Plaintiff was violating the residency requirement by living at the Stillwell property. Ex. G, BPU000197.

64. Dumovich took additional time during the investigation to obtain more information. Ex. C, 62:12-15.

65. Dumovich wanted to give Plaintiff time to list and sell the Stillwell property, which Plaintiff advised he planned to do at the November 2019 meeting. Ex. C, 78:19-25.

66. As mentioned during the meeting, Plaintiff did put the Stillwell property up for sale at one point, but he took it off the market after a short period of time because the listing was during the COVID-19 pandemic and his wife did not like people walking through the house. Ex. A, 85:10-20.

67. In March 2020 Torrez advised Dumovich that she planned to obtain additional surveillance of Plaintiff and then have a second meeting between Plaintiff and BPU. Ex. C, 79:4-80:17; Ex. K.

68. Subsequently, Chief Investigations surveilled Plaintiff three more times, on March 21, 22, and 23, 2020. Ex. C, 80:23-81:5; Ex. L.

69. Torrez authored another memorandum dated April 1, 2020 regarding her investigation into Plaintiff. Ex. M.

70. A second meeting was held April 9, 2020. Ex. C, 85:25-86:11.

71. One reason for the meeting, and the main reason for the second round of surveillance, was to close the loop on whether Plaintiff had sold the Stillwell property as he advised he was planning to do. Ex. C, 118:3-16.

72. Plaintiff wrote a second letter to BPU following this meeting. Ex. C, 88:14-24; Ex. N.

73. In this letter, Plaintiff wrote, "I feel targeted and discriminated against when employees have been re-hired who do not and have never lived in Wyandotte County." Ex. N.

74. Plaintiff then wrote another letter on April 17, 2020 that he sent to BPU as a formal complaint. Ex. C, 98:5:10.

75. This letter states, "[f]ollowing the April 16, 2020 meeting with Human Resources, I would like to file a written formal complaint against Human Resource employee Tammy Torrez." Ex. P.

76. Plaintiff writes that he had "been discriminated against and bullied by Ms. Torrez." Ex. P.

77. Plaintiff characterized Torrez's shack comment about the Kimball property as a "stereotypical comment" that was "not only offensive but also demonstrate[d] a form of prejudice." Ex. P.

78. Plaintiff continued, "[t]he problem with prejudice is that it often ends in discrimination, and or biased treatment of others." Ex. P.

79. Plaintiff complained that the surveillance was "bullying." Ex. P.

80. Plaintiff also complained that there was a police officer present at the April 2020 meeting. Ex. P.

81. Dumovich confirmed that an officer was present, but clarified that BPU very commonly has off-duty officers present, and that the officer was present because the prior meeting had been contentious. Ex. C, 96:20-97:1; 102:14-23.

82. Dumovich was unaware of whether the officer was armed. Ex. C, 97:17-19.

83. In response to this letter, Dumovich emailed Plaintiff on April 21, 2020. Ex. C, 100:12-14; Ex. P.

84. Dumovich wrote that the "BPU takes complaints very serious and any form of harassment will not be tolerated here.  We will conduct an investigation in the near future, however the investigation will be conducted by someone outside the Human Resources Department, so there is no potential for any conflict of interest." Ex. P.

85. As promised in Dumovich's email, BPU engaged attorney Tyler Hibler of Husch Blackwell, LLP to investigate Plaintiff's claims. Ex. C, 94:20-95:2; Ex. C, 100:15-20; Ex. Q.

86. Hibler's report investigated Plaintiff's complaint of race discrimination made in April 2020 and was issued on July 22, 2020. Ex. C, 95:7-14; Ex. Q.

87. Hibler's report noted that Plaintiff made a complaint on April 17, 2020 alleging the following:

> Torrez referred to a property owned by Owens' as a "shack," which Owens contends was a derogatory statement based upon his race and the racial demographics of the neighborhood in which the property is located;
> Owens' contends the length and intensity of the investigation into his residency was motivated by his race. This includes the nature and extent of surveillance activity utilized by BPU to verify the nature of Owens' residency.
> Owens contends he was subjected to multiple meetings with Human Resource personnel and his supervisors regarding his residency, which were designed solely to intimidate and harass; and
> Owens believes exculpatory evidence in the form of pictures/videos of him at a property he owns at 3211 Kimball Avenue in Kansas City, Kansas were withheld from him by Torrez.

Ex. Q, p. BPU000088-89.

88. Hibler interviewed Plaintiff, Torrez, Dumovich, Jeremy Ash, BPU's Executive Director of Electrical Operations, and Chance Baker, who performed surveillance of Plaintiff, and also evaluated numerous documents. Ex. Q, p. BPU000089-90.

89. Hibler's interview of Plaintiff was also attended by Dixon, Plaintiff's union representative. Ex. Q, p. BPU000092.

90. Hibler determined:

> Based upon the information reviewed during the course of our investigation, there is insufficient evidence to support a conclusion that the residency investigation – including its duration and extent – was undertaken due to Owens' race. In addition, there is insufficient evidence to support a conclusion that the residency investigation, or conduct associated with the investigation, was undertaken in retaliation for Owens' participation in protected activity under BPU's Harassment/Discrimination Policy.
> The residency investigation was initiated due to a factually accurate complaint that Owens owned a residence outside of Wyandotte County, Kansas, and that he and members of his family were living at the residence (Owens admitted to staying at the 17176 Stillwell Rd. property on occasion, and further admitted that members of his immediate family were living at that property). Further, the investigation began before any protected activity was engaged in by Owens – this includes the initial round of surveillance conducted in August and September 2019.

In regard to Owens' complaint associated with Torrez calling the property at 3211 Kimball Avenue a "shack," it is true Torrez made the comment. However, there is no substantial evidence supporting a conclusion that Torrez's comment was motivated by, or based upon, Owens' race or the racial demographics surrounding the area of the property. Additionally, based upon a recording of the November 4, 2019 meeting in which this comment was made, Owens himself referenced the property as a shack, and did not express any concern with the property at 3211 Kimball Avenue being referenced in such a manner. While Torrez's use of the phrase "shack" to reference a property owned by a BPU employee was inconsiderate and poor choice of words, the evidence gathered in our investigation does not support a conclusion that Torrez's comment was racially motivated.

Owens' complaint that exculpatory information and evidence was withheld by Torrez, and that Torrez failed to consider information provided by Owens is also unsupported. A review of surveillance footage provided by CHIEF Investigations to BPU, as well as interviews of multiple BPU employees and Chance Baker with CHIEF Investigations, indicates there was no instruction or direction by BPU to CHIEF Investigations to disregard or hide exculpatory information/surveillance. It is well documented that there were only two periods of surveillance activity – August/September 2019 and March 2020. There is no evidence that a pole camera was installed outside Owens' property at 3211 Kimball Avenue. Additionally, it appears inconsistent for Owens to assert that surveillance activity was harassing, when he asked on multiple occasions for BPU to conduct additional surveillance activity during his November 4, 2019 meeting with Human Resources personnel. It also appears Torrez considered and fully evaluated information provided by Owens in connection with the investigation. While Torrez expressed concerns associated with the authenticity and relevance of documents provided by Owens, the concerns expressed by Torrez appear to be legitimate and are not pretextual.

While we do not dispute that Owens found his two meetings with Human Resources personnel and his superiors to be concerning, the information gathered indicates these meetings were conducted for legitimate, non-discriminatory and non-retaliatory reasons – specifically to allow Owens to provide information on his own behalf and to answer questions BPU possessed related to Owens' residency. This was communicated to Owens during the November 4, 2019 meeting, and he and Alan Dixon - the Union representative who attended the meeting - acknowledge the benefit of having such a meeting. Additionally, the April 2020 meeting with Owens was designed to obtain a status update regarding the 17176 Stillwell Rd. property after Owens indicated he planned to sell the property and subsequent surveillance indicated he still owned (and possibly lived at) the property. Contrary to Owens' contention and belief, no decision was made regarding Owens' employment status prior to the April meeting.

Finally, Owens' contention that the intensity and scope of the investigation increased after he presented information and complaints on November 12, 2019 is not backed up by the investigation timeline or scope of surveillance activity performed. After the November 4, 2019 meeting, surveillance was not performed again until March 21, 2020. That surveillance was performed per the instruction of

Dumovich to determine if the property at 17176 Stillwell Rd. was for sale – which Owens suggested he was going to do during the November 4, 2019 meeting.  We are unaware of any evidence of additional surveillance activity being performed. Additionally, while Torrez did perform a very thorough investigation, the vast majority of the investigation was completed before Owens' November 11, 2020 letter which first raised concerns of biased treatment.  Any continued investigative activity appears to have been motivated by the need to determine the location of Owens' residence, not his race or potential protected activity.

Ex. Q, p. BPU000098-100.

91. Hibler concluded:

In conclusion, it is our assessment that while the residency investigation was extensive and there was a poor word choice by Torrez in utilizing the phrase "shack" to deserve the property at 3211 Kimball Avenue, there is insufficient evidence to support a conclusion that this activity was motivated by Owens' race or his complaints to Human Resources.  As a result, we did not find evidence indicating a violation of BPU's Equal Employment Opportunity Policy or AntiHarassment/Discrimination Policy.

Ex. Q, p. BPU000100.

92. On September 11, 2020, Dumovich emailed Plaintiff advising him that BPU was unable to substantiate or disprove Plaintiff's residency, so no disciplinary action would be taken against Plaintiff related to residency. Ex. A, 131:8-21; Ex. C, 103:23-104:11; Ex. J.

93. Dumovich's email also contained an apology for the length of the investigation and explained that he wanted to allow Hibler to complete his investigation. Ex. A, 132:2-8; Ex. J.

94. As of the September 11, 2020 email, the investigation was done. Ex. C, 104:12-16.

95. Dumovich took this additional time "to make sure that we made the right decision," adding, "I take someone's employment extremely seriously." Ex. C, 106:3-11.

96. Dumovich also testified that a decision was delayed to give Plaintiff as much time as possible to sell the Stillwell property as he had advised he would do. Ex. C, 118:17-20.

97. Plaintiff was never suspended or terminated as a result of the residency investigation. Ex. A, 140:1-5.

98. Plaintiff's union representative Dixon was present at both meetings, and never advised Dumovich that he felt Owens was being harassed, discriminated against, or retaliated against. Ex. C, 109:19-110:22.3.

99. Dumovich and Dixon speak four to five times a week, giving Dixon ample opportunity to make such comments. Ex. C, 110:24-111:9.

100.    Throughout the investigation, Plaintiff worked his regular hours, without any reduction in pay and without any suspension, discipline, or transfer. Ex. C, 114:8-115:5.

**D. FMLA Leave**

101.    Plaintiff took FMLA leave due to stress and anxiety. Ex A. 140:9:11.

102.    Plaintiff's FMLA leave started on April 8, 2020. Ex. C, 86:15-87.

103.    Dumovich was unaware that Plaintiff was on FMLA leave at the time of the second meeting on April 9, 2020. Ex. C, 87:7-11.

104.    Plaintiff used thirteen days of sick leave while on FMLA leave. Ex. A, 143:10-15, 144:20-23; Pretrial Order, ECF Doc. 50, p. 11.

105.    Plaintiff was allowed to use his sick leave so that he could receive regular wages while out on FMLA leave. Ex. C, 123:7-11.

106.    Plaintiff never communicated with HR or asked that he not have to use sick leave to be paid while on FMLA leave. Ex. A, 144:24-145:11.

107.    Plaintiff's grandmother, dad, and aunt died in three consecutive days towards at the end of his FMLA leave, causing him to take an additional week of bereavement leave. Ex. A, 145:13-23.

108.    The death of Plaintiff's grandmother caused anxiety and depression. Ex. A, 146:6-18.

109.     At the BPU, employees can cash out unused sick leave upon retirement, up to a certain amount that Dumovich could not recall. Ex. C, 123:12-21.

110.     Dumovich could not testify how many hours of sick leave Plaintiff banked, or whether Plaintiff would hit the cap of sick leave he could cash out by retirement. Ex. C, 123:18-124:3.

## E. Harassment and Discrimination

111.     Plaintiff testified that the mere fact he was surveilled and pictures were taken constitutes harassment. Ex. A, 72:7-11.

112.     Plaintiff testified that he felt harassed and discriminated against because he felt BPU was trying to fire him and misled him about surveilling him. Ex. A, 116:23-117:14.

113.     Plaintiff related this described harassment and discrimination to Torrez. Ex. A, 116:23-117:24.

114.     Plaintiff has confirmed that Torrez was the only source of harassment from BPU. Ex. A, 15:15-19.

115.     Dumovich testified that Plaintiff only complained about Torrez, and no other BPU employee. Ex. C, 114:4-7.

116.     Plaintiff has never heard Torrez make any comments that suggest any racial animus against Black people. Ex. A, 117:25-118:8.

117.     Plaintiff testified that he was offended that Torrez called the Kimball property a shack. Ex. A, 118:9-18.

118.     Plaintiff agreed that since 2015, four individuals have been terminated for residency violations: two White employees, one Black employee, and one Asian employee. Ex. A, 120:25-121:6; Ex I, p. 3-5.

119.      Plaintiff further acknowledged that employees investigated for residency violations but not fired, such as himself, run the gamut of race: White, Black, Asian, and Hispanic. Ex. A, 123:14-20; Ex I, p. 3-5.

120.      Twenty-two other BPU employees have been investigated for potential residency investigations since 2015. Ex. I, p. 3-5.

121.      Of the twenty-two investigated employees, nine were White, eight were Black, three were Asian, and two were Hispanic.

122.      The BPU has also surveilled six other employees in the course of residency investigations.

123.      Plaintiff is unaware of whether Torrez was involved in the termination or discipline of any other Black employees. Ex. A, 138:3-139:3.

## III.   ISSUES PRESENTED

1.  Whether Defendant should prevail on Plaintiff's claim of hostile work environment under §1981?

    a.  Whether Plaintiff has stated a *prima facie* case of hostile work environment?

2.  Whether Defendant should prevail on Plaintiff's claim of discrimination under §1981

    a.  Whether Plaintiff has stated a *prima facie* case of discrimination?

    b.  Whether Defendant has a non-discriminatory reason for the employment actions?

3.  Whether Defendant should prevail on Plaintiff's claim of retaliation under §1981

    a.  Whether Plaintiff has stated a *prima facie* case of retaliation?

    b.  Whether Defendant has a non-discriminatory reason for the employment actions?

## IV.   ARGUMENTS AND AUTHORITIES

### A.  Summary Judgment Standard

"The very purpose of summary judgment is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  "The moving party bears the burden to show the absence of a genuine issue of material fact." *Bennet v. Henderson*, 15 F.Supp.2d 1097, 1103 (D. Kan. 1998).  Once the moving party has satisfied its burden, "the burden shifts to the nonmoving party who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'"  Id. (quoting *Anderson*, 477 U.S. at 256).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  Id.  Here, there is no significant probative evidence tending to support Plaintiff's claims in this case, and summary judgment should therefore be entered in favor of Defendant.

**B.  Hostile Work Environment Under §1981**

1.  Plaintiff Cannot Establish a *Prima Facie* Case of Hostile Work Environment Under §1981

The same substantive standards apply to §1981 claims as to Title VII claims. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1170 (10th Cir. 2018).  To establish a prima facie case of hostile work environment, Plaintiff must show that:

> (1) [he] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on race; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.

*Id.*, citing *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015).  Defendant concedes that Plaintiff is a member of a protected group.  However, the uncontroverted facts of this case cannot support the next three factors.

First, while the investigation into Plaintiff's residency may have been unwelcomed by Plaintiff, it was not "harassment."  Defendant has a uniform residency requirement that applies to all employees, including Plaintiff. Fact ¶¶ 3-21.  While Defendant recognizes that no employee desires to be investigated, the mere fact that Plaintiff's residency was investigated does not constitute harassment in and of itself.  Plaintiff signed a Certificate of Residency that specifically included an acknowledgement that the BPU actively investigates complaints about residency violations. Fact ¶¶ 14-15.  Indeed, in the past five years, twenty-two other employees have been investigated for potential residency investigations, and surveillance has been used for six other investigations. Fact ¶¶ 119-122.  Plaintiff was not singled out, nor was he investigated in a manner different from other employees of the BPU.  The mere fact that Plaintiff was investigated does not constitute harassment.

Second, Plaintiff cannot establish that the alleged harassment was based on his race.  The investigation into his residence was based on where he lived at the time, not his race.  Nor was the character of the residency investigation driven or caused by Plaintiff's race.  Plaintiff complains that he was placed under surveillance during the residency investigation, but surveillance has been used by Defendant in residency investigations for numerous individuals, regardless of race. Fact ¶¶ 121-122.  In *Payan*, the Tenth Circuit cited to a lack of evidence that the plaintiff's supervisor (and alleged harasser) displayed animus to other members of the plaintiff's protected class.  Here, there are no facts so suggest any racial animus by Torrez or Dumovich. *See* ¶¶ 91, 116.  Plaintiff

has never heard Torrez make any comments that suggest any racial animus against Black people. Fact ¶ 116.

Third, the alleged harassment was neither severe nor pervasive. "To survive summary judgment 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Payan*, 905 F.3d at 1171 (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004)). This requires Plaintiff show that his work environment was both objectively and subjectively hostile. *Id.* Defendant concedes that Plaintiff has testified that he was subjectively offended by the investigation. Defendant contests that a reasonable person would likewise be offended. Objective hostility is analyzed considering all the circumstances, based on a reasonable person's perspective. *Id.* Courts require more than "mere snubs, unjust criticisms, and discourteous conduct." *Carpenter v. Sw. Bell Tel. Co.*, 27 F. Supp. 3d 1168, 1171 (D. Kan. 2014), (quoting *Hudson v. AIH Receivable Mgmt. Servs.*, 10–CV–2287–JAR, 2012 WL 5306277, at *3 (D. Kan. Oct. 29, 2012)). Rather, courts evaluate the frequency of the conduct, severity of the conduct, whether the conduct was physically threatening or humiliating or whether it was a mere offensive utterance, and whether it unreasonably interfered with Plaintiff's work performance. *Payan*, 905 F.3d at 1171. Here, the conduct was infrequent: Plaintiff's investigation consisted of two meetings he had to attend, and two instances of surveillance. Fact ¶¶ 46, 49, 68, 70. The meetings did not result in any discipline, and Plaintiff does not suggest that meeting with human resources is severe in and of itself. Fact ¶ 100. Nor did Plaintiff testify that the investigation impeded his work performance.

The plaintiff in *Payan* offered the following examples of harassment, which the court found did "not rise to the level of discriminatory intimidation, ridicule, and insult that is necessary for a hostile work environment claim:"

> Mr. Payan testified in his deposition about Mr. Martinez's anger and aggression, his comments about Mr. Payan being a liar and incompetent as a manager, his questions to Mr. Payan about out-of-work appointments, and his grilling of Mr. Payan on work-related matters. Mr. Payan further contends that Mr. Martinez postponed completing his career development evaluation, did not travel from Arizona to Utah to "help him," "refused to call Payan to discuss issues and, Payan felt, was generally trying to ruin [his] career." Finally, Mr. Payan points to the declarations of Jerry Barbillon and Dave VanGorder, other Security Managers, to support his claims. Mr. Barbillon noted that Mr. Martinez was disrespectful, critical, condescending, and abusive toward Mr. Payan during weekly conference calls. Mr. VanGorder said that Mr. Martinez also regularly emphasized Mr. Payan's poor performance during the meetings, even though his division always did well compared to the other ones. He attested that, "Martinez treated Mr. Payan the worst of all of the Security Managers that he supervised, including myself, on our conference calls." While Mr. Payan may have subjectively believed that Mr. Martinez's harassment was severe, we are not persuaded that it was objectively sufficient to create the required pervasively hostile and abusive working environment.

*Id.* at 1171-72 (internal citations omitted). Here, nobody called Plaintiff a liar or told him he was incompetent, no BPU employees refused to work with or help Plaintiff, and there are no corroborating witnesses to describe "disrespectful, critical, condescending, and abusive" comments towards Plaintiff. While Torrez did call Plaintiff's house a "shack," that was a single comment. Further Dumovich heard the comment and did not feel it was racially motivated. Fact ¶ 57. Similarly, Hibler's report did not conclude that the comment was racially motivated or constituted harassment. Fact ¶¶ 90-91. Outside of the investigation, Plaintiff does not assert that any BPU employees criticized Plaintiff related to his residency while he was at work. In sum, nothing on the laundry list of conduct that the Tenth Circuit cited in *Payan* for necessary findings that harassment was sufficiently severe and pervasive exist in this case. This case falls well short of the conduct at issue in *Payan*.

Similarly, in *Carpenter*, the court found that harassment was not sufficiently severe or pervasive.  The court noted that one or a few incidents are not enough, but rather a plaintiff must show "'a steady barrage' of racial acts or comments." *Carpenter*, 27 F.Supp.3d at 1171 (quoting *Douglass v. Gen. Motors Corp.,* 368 F.Supp.2d 1220, 1231 (D.Kan.2005)).  In doing so, the *Carpenter* court looked to *Brown v. Cargill*, in which the comment "black people don't work at Cargill" by itself, without other evidence that the alleged harassment was racially motivated, was insufficient to sustain a hostile work environment claim. *Id.* at 1172 (citing *Brown v. Cargill*, No. 09–2570–CM, 2010 WL 4440086, at *1 (D. Kan. Nov. 1, 2010)).  Here, Plaintiff has not identified a "steady barrage" of racial acts or comments.  Rather, there was a single comment about his house being a "shack" which he took in a racially derogatory way.  Plaintiff alleges that the surveillance was harassment, but has no evidence that he was surveilled due to his race.  Even so, he was surveilled eleven times over two weeks and several months later was surveilled three times in as many days. Fact ¶¶ 46, 67. This does not constate a "steady barrage."

Fourth, the alleged harassment did not alter any terms, conditions, or privileges of Plaintiff's employment.  Plaintiff's sole position on this point is that he had to use thirteen sick days while on FMLA leave, which he claims was necessitated by the alleged harassment. Fact ¶ 104  Plaintiff was not terminated, disciplined, suspended, demoted, docked pay, or transferred.  Based on these reasons, Plaintiff cannot establish a prima facie case of hostile work environment.

### C. Discrimination Under §1981

The Tenth Circuit applies the *McDonnell Douglas* framework to claims of discrimination or retaliation under both Title VII and §1981. *Mann v. XPO Logistics Freight, Inc.*, 819 Fed.Appx 585, 594 (10th Cir. 2020).  Without any direct evidence of discrimination, the *McDonnell Douglas* framework consists of a three-part test:

> First, the plaintiff must make out a prima facie case.  Second, if the plaintiff makes
> out a prima facie case, the burden shifts to the employer to assert a legitimate
> nondiscriminatory reason for its actions.  If the employer does so, the burden shifts
> back to the plaintiff to introduce evidence that the stated nondiscriminatory reason
> is merely a pretext.

*Id.* at 595 (internal citations and quotations omitted).  Here, there is no direct evidence of discrimination.

### 1.   Plaintiff Cannot Establish a Prima Facie Case of Discrimination Under §1981

The first inquiry is whether Plaintiff has stated a prima facie case of race discrimination. A prima facie case of race discrimination under §1981 requires Plaintiff to establish that: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3), he is qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class. *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 603 (10th Cir. 2019).  Defendant concedes that Plaintiff has established the first and third prongs.

Plaintiff has not established that he sustained an adverse employment action. In *Miller v. Maddox*, the District of Kansas noted that while a refusal to promote and pay increase denial could be considered adverse employment actions, an investigation into the plaintiff was not. 51 F.Supp.2d 1176, 1189.  The investigation "was, without question, at least an inconvenience for plaintiff," but the court reasoned that the defendant had an obligation to investigate serious allegations. *Id.*

In a constructive discharge case, the District of Kansas concluded that an investigation into an employee's attendance, which was started within a few weeks of protected activity, was nonetheless not retaliation because it did not affect the "responsibilities, benefits, or compensation" and there was a prior finding that there had been no constructive discharge,

meaning there had been no adverse employment action. *Watson v. Lucent Techs., Inc.*, 92 F.Supp.2d 1129, 1136 (D. Kan. 2000).

The Tenth Circuit has held that under §1983 and the First Amendment, an "an investigation of potential misconduct … will generally not constitute an adverse employment action." *Couch v. Bd. of Trustees of Memorial Hosp. of Carbon County*, 587 F.3d 1223, 1243 (10th Cir. 2009). More recently, it has held that this First Amendment standard is "analogous" to the Title VII standard of an adverse employment action, citing favorably to *Couch* to conclude that a workplace investigation, even a criminal workplace investigation, was not an adverse employment action. *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018). The above cases demonstrate the rule that investigations are not generally harassment. Plaintiff cannot demonstrate any parts of his investigation that were so significant as to take this case out of the general rule and into harassment.

The only alleged adverse employment action in this case related to compensation or benefits is that Plaintiff used thirteen sick days so that he could receive paid FMLA leave, which he contends was necessitated by the stress and anxiety of the residency investigation. Fact ¶¶ 101, 104-05. This is not adverse employment action taken *by the employer.* Rather, Plaintiff's FMLA leave and his election to use of paid sick leave to be compensated while he was on FMLA leave were actions taken *by the Plaintiff at Plaintiff's request.* Plaintiff, not Defendant, requested FMLA leave and completed the necessary leave request. Plaintiff, not Defendant, requested that his FMLA leave be compensated through the use of his accumulated sick leave. Fact ¶ 105. Upon the *Plaintiff's request* for FMLA leave, Defendant was required by the FMLA to grant him his requested leave. Defendant was also required by law to allow Plaintiff to use his accumulated leave to be compensated for his FMLA absence. 29 C.F.R. § 825.207. Plaintiff is now attempting to argue that his decision to exercise his legal rights under the FMLA was action that was: (1) adverse;

and (2) taken by his employer. Such arguments should be rejected. Plaintiff cannot be permitted to create his own adverse employment action through his exercise of his legal rights under the FMLA.

Plaintiff will likely argue in response that Defendant's actions necessitated his use of FMLA leave. However, Defendant's challenged actions lie within its residency investigation, which, according to the foregoing precedent should not be deemed to be an adverse employment action. The above cases demonstrate that an investigation that results in no discipline does not constitute an adverse employment action. As in *Miller*, while the investigation may have been an inconvenience, it did not rise to the level of an adverse employment action. The uncontroverted facts in this case fail to show what part of Plaintiff's employment was adversely affected. He was not terminated, disciplined, suspended, demoted, docked pay, transferred, denied a transfer, or denied a promotion. Plaintiff cannot demonstrate that he suffered an adverse employment action.

Nor can Plaintiff argue that he was treated disparately compared to other employees not in his protected class. Twenty-two other BPU employees have been investigated for potential residency investigations since 2015. Fact ¶ 120.  Of the twenty-two investigated employees, nine were White, eight were Black, three were Asian, and two were Hispanic. Fact ¶ 121. Employees of all races have been investigated for potential residency violations at the BPU. Like Plaintiff, all twenty-two of these employees were not found to be in violation of the policy and were thus not terminated.

Plaintiff cannot state a prima facie case of discrimination because there has not been an adverse employment action and he was not treated less favorably than employees outside his protected class.

2.  <u>Defendant Had A Non-Discriminatory Reason For Its Actions</u>

If the Court finds that Plaintiff has established a *prima facie* case of discrimination, Defendant has the burden of demonstrating non-discriminatory reasons for the employment decisions about which Plaintiff now complains.

As to Plaintiff's complaints about the investigation into his residency, The BPU investigated Plaintiff the same way it has investigated several other employees, regardless of race. Indeed, no discriminatory intent can be divined from the distribution of employees investigated for residency violations by race. Fact ¶ 121. The BPU received a complaint that Plaintiff was violating the residency requirement, and as indicated on the Certificate of Residency signed by Plaintiff and all other BPU employees, this complaint was investigated. Fact ¶¶ 10, 11, 14, 15. The initiation of an investigation into Plaintiff was not discriminatory.

Nor was the use of surveillance. The BPU has used surveillance on multiple other employees. Fact ¶ 121. The extent of surveillance was also non-discriminatory given the circumstances of the investigation. Plaintiff was surveilled eleven times over two weeks and several months later Plaintiff was surveilled three times in as many days. Fact ¶¶ 46, 67. Plaintiff has pointed to nothing in the record that would suggest that this level of surveillance is related to his race. Rather, it was related to the difficulties in establishing Plaintiff's residency. During the first round of surveillance Plaintiff was surveilled going to the Stillwell property ten times, compared to the Kimball property only twice. Fact ¶ 48. In fact, it was the investigator's determination that Plaintiff was living at the Stillwell property in violation of the residency requirement. Fact ¶ 47. The second round of surveillance was obtained to determine whether Plaintiff was still going to the Stillwell property and renovating it, or whether he had sold it as Plaintiff indicated he intended to do at the November 2019 meeting. Fact ¶¶ 65-66. The BPU could

have just stopped at the first round of surveillance, which was not in Plaintiff's favor, but chose to conduct additional surveillance to corroborate Plaintiff's story. Additionally, neither Plaintiff's wife nor his children were living at the Kimball property. Fact ¶¶ 27, 28, 34. The fact that surveillance was used, and the number of dates that surveillance was used, were both non-discriminatory. The BPU simply wanted to determine if Plaintiff was violating the residency requirement, and used the same investigative tools it used for several other employees, given the complex living situation Plaintiff had presented.

Plaintiff may argue that the length of the investigation demonstrates discrimination. However, Dumovich testified that he was giving Plaintiff time to sell the Stillwell property, which Plaintiff advised he would do. Fact ¶ 65. Dumovich was also presented with conflicting evidence: the surveillance and Torrez's memo found that Plaintiff was violating the residency requirement, while Plaintiff presented documentation proffered to verify that he was living at the Kimball property. Fact ¶¶ 47, 58, and 63. Indeed, neither Plaintiff's wife nor his children lived at the Kimball property. Fact ¶¶ 27-28. At the same time, Plaintiff provided documentation and the November 11, 2019 letter to show that he was living at the Kimball property in compliance with the residency policy. Fact ¶ 58-59. Additionally, before Dumovich came to a conclusion on Plaintiff's investigation, the BPU had an outside law firm investigate Plaintiff's complaint against Torrez, and that report was not complete until July 22, 2020. Fact ¶¶ 85-86. 93. Lastly, Plaintiff cannot show that other employees who were investigated received dispositions quicker than he did. Thus, Plaintiff cannot rely on any similarly situated employees to support claims of discrimination based on the length of the investigation.

To the extent Plaintiff asserts that the presence of a police officer outside the April 2020 meeting was discriminatory, Dumovich testified that BPU very often has such officers present,

and the officer was present because the first meeting between Plaintiff and BPU officials was a contentious one. Fact ¶ 81.

Plaintiff only identified Torrez as the source of alleged discrimination. Fact ¶ 114-115. However, Plaintiff admitted that he has never heard Torrez make any comments that suggest racial animus against Black people. Fact ¶ 116. Thus, outside his own complaints about Torrez, Plaintiff has provided no evidence to suggest that Torrez was acting with any racial animus against him due to his race.

The BPU's residency rule is located near the front of its policies, contains a lengthy discussion of the significant ramifications for its violation (termination), and is accompanied by Certificates of Residency that employees complete. Fact ¶¶ 3-21. It is evident that the BPU takes this policy seriously, and it acted accordingly when it used serious consideration to evaluate a complaint that Plaintiff was not complying with this policy. Plaintiff cannot establish that his race was the "but-for" cause of any alleged acts of discrimination in this case.

**D. Retaliation Under §1981**

As discussed *supra*, the *McDonnell Douglas* framework also applies to claims of retaliation under §1981.

1. <u>Plaintiff Cannot Establish a Prima Facie Case of Discrimination Under §1981</u>

A prima face case of retaliation requires that the plaintiff show that "(1) he engaged in protected opposition to discrimination; (2) [the employer] took action against him which a reasonable person would have found materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action." *Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 606 (10th Cir. 2020) (quoting *Singh v. Cordle*, 936 F.3d 1022, 1042 (10th Cir. 2019)). Here, Plaintiff engaged in protected opposition by filing a complaint on April 17,

2020, but no adverse actions were taken at any point and no causal connections existed between any alleged protected activity and adverse action.

First, regardless of what Plaintiff's protected activity was, and when it occurred, in this case, he did not sustain any adverse employment actions.  Defendant incorporates its arguments from Section IV.C.1, *supra*.

Second, Defendant concedes that Plaintiff's complaint made on April 17, 2020 was protected activity. However, no adverse employment actions have been alleged as taking place after this complaint. Between this complaint and the September 11, 2020 email from Dumovich advising Plaintiff of the investigation outcome, no adverse employment actions occurred, no additional surveillance occurred, no further meetings with human resources occurred. What did occur was a thorough outside investigation into this complaint. Fact ¶¶ 85-91.

Defendant expects that Plaintiff will characterize his letter dated November 11, 2019 as a complaint that constitutes protected activity. Plaintiff's letter does not specifically allege that he was discriminated against on the basis of his race. Fact ¶ 61. While an employee need not use any specific legal language for a complaint to constitute protected activity, the complaint must oppose discrimination in its entirety "and not merely take form for complaints about personal grievances." *Wirtz v. Kansas Farm Bureau Servs., inc.*, 274 F.Supp.2d 1198, 1213 (D. Kan. 2003). Plaintiff's November 11, 2019 describes his personal issues with the investigation and the meeting, discussing his conflicts with Torrez. Fact ¶¶ 59-60. This letter, read as a whole, does not constitute an opposition to prohibited discrimination.  Rather, it is simply a complaint by one employee about his own personal grievances. Further, there is no evidence that Plaintiff thought he was making a protected complaint against discrimination at the time. *Beck v. Figeac Aero North American, Inc.*, 382 F.Supp.3d 1170, 1177 (D. Kan. 2019) (finding that complaint to HR was a protected

opposition to discrimination because the complainant thought she was complaining about prohibited conduct by Title VII). Because Plaintiff did not think he was complaining about prohibited racial discrimination, this letter does not constitute protected activity.

Even assuming *arguendo* that the November 11, 2019 letter constituted protected activity, no adverse action was taken against Plaintiff as a result. Defendant incorporates its discussion of a lack of adverse action from Section IV.C.1, *supra*. Additionally, this Court has held that for a retaliation claim under Title VII, an action is materially adverse if it would have dissuaded a reasonable worker form making or supporting a charge of discrimination. *Jones v. Wichita State Univ.*, 528 F.Supp.2d 1182, 1193 (D. Kan. 2007). The fact that Plaintiff complained in April 2020 is clear evidence that any actions taken between the November 2019 letter and the April 2020 complaint did not and would not have dissuaded Plaintiff from making a complaint of discrimination.

Further assuming for the sake of argument that Plaintiff's FMLA leave and use of sick time constitutes an adverse employment action, both are too removed temporally from the November 11, 2019 letter to support a finding of retaliation.  In *Hanson v. Colorado Judicial Dept.*, the Tenth Circuit concluded that a four-month gap between protected activity and the adverse action was "too protracted to permit an inference of retaliation, without more." 564 Fed. Appx. 916, 920 (10th Cir. 2014). After November 11, Plaintiff does not allege any improper conduct until the second round of surveillance, which occurred March 21 to 23, 2020. Plaintiff did not take FMLA leave until April 8, 2020. Fact ¶ 102. That time period is, like *Hanson*, four months. Without any other intervening actions being taken by the BPU, the gap between November 11, 2019 and March 21, 2020 is too protracted to permit an inference of retaliation.

Lastly, Plaintiff cannot claim that the investigation into his residency itself constituted retaliation. An employer "need not suspend previously planned adverse employment actions upon encountering an employee's protected activity. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1185 (10th Cir. 2016) (quoting *Clark City School Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). Whether Plaintiff's protected activity occurred in November 2019 or April 2020, it is undisputed that the residency investigation was underway before either letter.  Fact ¶¶ 44-49. As stated in *Foster*, Defendant did not need to suspend its previously planned investigation due to Plaintiff's complaint. The fact that Plaintiff was being investigated prior to his complaints also demonstrates that his complaint was not the "but-for" cause of the residency investigation.

2.   Defendant Had A Non-Discriminatory Reason For Its Actions

Defendant's non-discriminatory reasons for Plaintiff's termination have been discussed, *supra*, in Section IV.C.2 and Defendant incorporates them here by reference.

V.   **CONCLUSION**

For all the reasons stated above, Defendant is entitled to summary judgment on all claims and against Plaintiff.

Respectfully submitted,

McANANY, VAN CLEAVE & PHILLIPS, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103
Phone: (913) 371-3838
Fax: (913) 371-4722
rdenk@mvplaw.com
slow@mvplaw.com

  /s/ Spencer A. Low
Ryan B. Denk #18868
Spencer A. Low #27690

*Attorneys for Defendant Unified Government of*
*Wyandotte County/Kansas City, Kansas*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on the 22nd day of February, 2022, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

Bert S. Braud
The Popham Law Firm, P.C.
712 Broadway, Suite 100
Kansas City, Missouri 64105
bbraud@pophamlaw.com

*Attorneys for Plaintiff*

  /s/ Spencer A. Low