# EXHIBIT

# A

*STERLING OWENS vs.*

*UNIFIED GOVERNMENT OF WYANDOTTE COUNTY*

---

*DEPOSITION OF STERLING M. OWENS*

*January 20, 2022*

---



mcr@metropolitanreporters.com

www.metropolitanreporters.com

913.317.8800   800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!



WWW.DEPOSPAN.COM

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 3

1          IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF KANSAS
3
4    STERLING OWENS,
5              Plaintiff,
6    vs.                        No. 2:21-CV-02185
7    UNIFIED GOVERNMENT OF WYANDOTTE
8    COUNTY/KANSAS CITY, KANSAS, As
9    Representative of Kansas City
10   Board of Public Utilities,
11             Defendant.
12
13
14
15        DEPOSITION OF STERLING M. OWENS, the
16   Plaintiff, taken on behalf of the Defendant before
17   Nissa M. Sharp, CSR No. 528, CCR No. 528, pursuant
18   to Notice on the 20th of January, 2022, at The Popham
19   Law Firm, PC, 712 Broadway, Suite 100, Kansas City,
20   Missouri.
21
22
23
24
25

Page 2

1                   APPEARANCES
2
3    APPEARING FOR THE PLAINTIFF:
4        Mr. Bert S. Braud
         The Popham Law Firm, PC
5        712 Broadway
         Suite 100
6        Kansas City, Missouri  64105
         (816) 221-2288
7        bbraud@pophamlaw.com
8
9    APPEARING FOR THE DEFENDANT:
10       Mr. Ryan B. Denk
         Mr. Spencer A. Low
11       McAnany, Van Cleave & Phillips
         10 East Cambridge Circle
12       Suite 300
         Kansas City, Kansas  66103
13       (913) 371-3838
         rdenk@mvplaw.com
14       slow@mvplaw.com
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                        INDEX
2    WITNESS:                          PAGE:
3    STERLING M. OWENS
4        Examination By Mr. Denk           6
5        Examination By Mr. Braud        146
6        Examination By Mr. Denk         149
7
8                      EXHIBITS
9
10   EXHIBIT                               PAGE
     NUMBER     DESCRIPTION           IDENTIFIED
11   1          Kansas City Board of Public   28
                Utilities Employee Handbook
12              2018 - BPU 1-86
13   2          9/21/16 Certificate of        30
                Employee Residency - BPU 311
14
     3          12/5/19 Investigative Report  43
15              from Torrez to Dumovich -
                BPU 157-198
16
     4          2016-2019 Utility Usage       90
17              Spreadsheet - BPU 321-324
18   5          10/26/16 Kansas Standard      92
                Offense Report - BPU 253
19
     6          Bank of America Account       95
20              Information - BPU 254
21   7          Voter Registrant Detail -     96
                BPU 255
22
     8          Copy of Driver's License -    96
23              BPU 256
24
25

1                 EXHIBITS CONTINUED
2
     EXHIBIT                               PAGE
3    NUMBER     DESCRIPTION           IDENTIFIED
4    9          Vehicle Registration         97
                Receipts - BPU 257-258
5
     10         8/29/16 Separation Agreement 98
6               - BPU 259-261
7    11         Photographs - BPU 266-271   102
8    12         Lock Activity - BPU 272-287 103
9    13         10/7/19 Leavenworth County  110
                Residential Permit - BPU 288
10
     14         Lock Activity - BPU 263-265 103
11
     15         7/22/20 Letter from Hibler  112
12              to Dumovich Re Sterling
                Owens Investigation - BPU
13              88-100
14   16         4/9/20 Memo from Owens to   112
                Kansas City Kansas Board of
15              Public Utilities Human
                Resource Re Meeting Status
16              of Residence - BPU 136
17   17         1/4/20 Lease Agreement      125
18   18         4/1/20 Investigative Memo   130
                from Torrez to Dumovich Re
19              Allegation Violation of
                Residency Requirement - BPU
20              243-249
21   19         Time Records - BPU 345-347  129
22   20         Defendant's Answers and     119
                Objections to Plaintiff's
23              First Interrogatories to
                Defendant
24
25

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

**Page 5**

```
1              EXHIBITS CONTINUED
2
     EXHIBIT                              PAGE
3    NUMBER    DESCRIPTION             IDENTIFIED
4    21     9/11/20 Email from Dumovich   131
            to Owens Re Residency
5           Requirement Response - BPU
            87
6
     22     11/11/19 Memo from Owens to   132
7           Kansas City Kansas Board of
            Public Utilities Human
8           Resource Re Residency
            Allegations - BPU 118
9
     23     11/11/19 Memo from Owens to   147
10          Kansas City Kansas Board of
            Public Utilities Human
11          Resource Re Residency
            Allegations and Attachments
12          - PLF-SO 22-63
13
14   NOTE:  Original Owens Exhibits 1 through 23 were
            attached to the original transcript.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

1    (Deposition commenced at 10:17 AM.)
2         STERLING M. OWENS,
3  being first duly sworn, testified under oath as
4  follows:
5         EXAMINATION
6  BY MR. DENK:
7    Q.   Please state your full name for the
8  record.
9    A.   Sterling M. Owens.
10   Q.   Have you ever gone by any other names?
11   A.   No.
12   Q.   Okay.  Where are you from, Mr. Owens?
13   A.   Detroit, Michigan.
14   Q.   When did you move from Detroit to
15 Kansas City?  Or were there places in between?
16   A.   Right out of high school in '93.
17   Q.   Okay.
18   A.   I was back and forth, though, as a
19 kid. I came back and forth, so I really couldn't
20 tell you how many times. My mom is here, she worked
21 at Ford, so.
22   Q.   She worked at Ford?
23   A.   Yeah.  So I was back and forth between
24 my mom and grandma.
25   Q.   Okay.  Where did you go to high

**Page 7**

1  school?
2    A.   I went to three high schools, I went
3  to Southwest -- graduated Southwestern in Detroit.  I
4  went to DeSoto and I went to Central.
5    Q.   Okay.  Central in Kansas City?
6    A.   Yes.
7    Q.   Okay.  Any college education?
8    A.   Johnson County Community, couple years
9  there for electrical.
10   Q.   And so were you part of an
11 apprenticeship program at Johnson County?
12   A.   No.  It was just school.
13   Q.   And you have been a lineman for how
14 long?
15   A.   I started the apprenticeship in 2007.
16   Q.   And where was that at?  Who ran that
17 apprenticeship program?
18   A.   That was KCP&L, now Evergy.
19   Q.   And so I assume you worked for KCP&L
20 during the apprenticeship program and then for some
21 period of time after?
22   A.   From 2007 and then I hired on at BPU
23 in 2013 I believe.
24   Q.   Okay.  Why did you leave KCP&L?
25   A.   Because I'm just -- everything I do is

**Page 8**

1  in Wyandotte County and it was more convenient.
2    Q.   What do you mean everything you do is
3  in Wyandotte County?
4    A.   I have rental properties, just always
5  have pretty much lived in Wyandotte County my adult
6  life pretty much.  And when I hired on at Evergy, it
7  was the intentions to go to BPU.  I had tried to hire
8  on at BPU when I was younger, never could get in, and
9  I just found a different route to get there.
10   Q.   Did you become a journeyman at KCP&L?
11   A.   Yes.
12   Q.   Okay.  And you're married?
13   A.   Yes.
14   Q.   When were you married?
15   A.   2005.
16   Q.   And your wife's name is ShaRita; is
17 that correct?
18   A.   Yes.
19   Q.   How many children do you have?
20   A.   We have four.
21   Q.   What are their ages?
22   A.   Twenty-five, twenty-four,
23 twenty-three, nineteen.
24   Q.   Any of them living in the home with
25 you presently?

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
METROPOLITAN
COURT REPORTING ♦ LEGAL VIDEO

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 13

1 agreed?
2    A.    That's agreed.
3    Q.    Okay.  So if I ask anything that's,
4 you know, there's a question in your mind, just tell
5 me and I'll try to rephrase it in a way that you do
6 understand.  Is that okay?
7    A.    Yes.
8    Q.    Okay.  And I should have asked this at
9 the beginning, is there any reason you can't give
10 full and accurate testimony here today?
11    A.    Only if I can't remember.
12    Q.    Okay.  I mean, you're not on any
13 medications or anything like that which would impair
14 your ability to give full and accurate testimony; is
15 that correct?
16    A.    Not at the moment.
17    Q.    Okay.  So, the 5203 Farrow address,
18 that is also in Kansas City, Kansas, correct?
19    A.    Yes.
20    Q.    And that would also be in the USD 500,
21 meaning Kansas City, Kansas, public schools, correct?
22    A.    Yes.
23    Q.    All right.  And so when your kids went
24 to Piper, my recollection from the record is that
25 prior to your 2016 Certificate of Residency Change,

Page 14

1 that you had a Piper address that was listed with
2 BPU, correct?
3    A.    Yes.
4    Q.    Okay.  And so do you recall the
5 address for that location or what street it was on?
6    A.    It was at 4346 North 122nd.
7    Q.    Okay.  And so was that the residence
8 that you lived at when your kids were going to Piper?
9    A.    Yes.
10    Q.    How long did you reside at that
11 address?
12    A.    Since 2005.
13    Q.    So 2005 through 2016, through I think
14 the Certificate of Residency Change was --
15    A.    I believe --
16    Q.    -- September of 2016.  Does that sound
17 right?
18    A.    Sounds accurate.
19    Q.    Okay.  And so if I understood your
20 prior testimony, you were living at the -- I forget
21 the name of the street -- the Gill -- Kimball Avenue
22 address starting in 2016, and then your wife was
23 living at the Farrow address; is that correct?
24    A.    Yes.
25    Q.    Okay, we'll circle back to that.

Page 15

1        Is your wife from Kansas City?
2    A.    Yes.
3    Q.    Where did she go to high school?
4    A.    Bonner Springs.
5    Q.    Does your wife work?
6    A.    Yes.
7    Q.    Where does she work?
8    A.    Anderson & Sons Trucking.
9    Q.    Is that in Bonner Springs?
10    A.    Edwardsville.
11    Q.    How long has she worked there?
12    A.    Over 20 years.
13    Q.    What does she do for them?
14    A.    She runs the office.
15    Q.    So this case is pending in federal
16 court, the reason I'm going to ask these questions is
17 I'm trying to figure out whether or not anyone on a
18 potential jury venire might be related to you.
19        So, do you have any family members
20 that reside in Leavenworth, Wyandotte, Johnson, Miami
21 or Douglas counties?
22    A.    I do not.
23    Q.    What was your wife's maiden name?
24    A.    Anderson.
25    Q.    So is that her brother she's working

Page 16

1 for?
2    A.    Her dad.
3    Q.    What kind of trucking do they do?
4    A.    Hauling gravel.
5    Q.    Prior to making the claim in this case
6 that you've made against the BPU, have you ever
7 made -- or let me start with prior to litigation.
8        Have you ever been a party to a
9 lawsuit?
10    A.    No.  Not that I recall.
11    Q.    Have you ever made a legal claim or
12 demand for money prior to this litigation?
13    A.    No.
14    Q.    Have you ever made a prior complaint
15 of discrimination prior to the situation which led to
16 this lawsuit?
17    A.    Are you saying not with BPU?
18    Q.    Or with BPU.
19    A.    No, I don't think so.
20    Q.    How about prior claims of harassment?
21    A.    Not that I can recall.
22    Q.    Prior claims of retaliation?
23    A.    Not that I can recall.
24    Q.    How old are you, Mr. Owens?
25    A.    Forty-six.

Page 21

1    Q.    Okay.  So, at least in practice, your
2  wife acted as an individual who had the authority, at
3  least, to fill out school enrollment papers?
4    A.    That's correct.
5    Q.    Okay.  And would it, or if you know,
6  was it the Bonner Springs address off of 177th Street
7  that she used for that enrollment?
8    A.    I don't recall.
9    Q.    Or 171st, pardon me.
10        So, there are two addresses here that
11  I'm going to refer to today, it's 3211 Kimball
12  Avenue, Kansas City, Kansas.  Can we agree I'll just
13  refer to that as the Kimball address?
14    A.    Yes.
15    Q.    Okay.  And then there's 17176
16  Stillwell Road, Bonner Springs, Kansas.  Can we
17  simply agree that I'll refer to that as the Bonner
18  Springs address?
19    A.    Yes.
20    Q.    All right.  And you were the owner of
21  and still are the owner, my understanding, of both of
22  those addresses, correct?
23    A.    Correct.
24    Q.    And that was true from 2016 all the
25  way through the present?

Page 22

1    A.    Correct.
2    Q.    Okay.  So you don't know whether your
3  wife listed the Bonner Springs address to enroll
4  Tyler in Bonner Springs schools?
5    A.    I do not.
6    Q.    So tell me about the history of you
7  and your wife and when you co-habitated, meaning, you
8  lived under the same roof and then when you have been
9  at least physically separated, you were not living
10  under the same roof.  If you can kind of work from
11  today working backwards to -- let's work backwards to
12  the time that you completed the last residency
13  certificate which was in 2016.
14    A.    Can you ask one more time that
15  question?
16    Q.    Yeah.  So give me the history of when
17  you and your wife, working backwards from today, when
18  you've lived together, you've co-habitated, living
19  under the same roof, and then when you have lived
20  under different roofs, meaning in separate houses
21  working back from today back until 2016.
22    A.    From today, we still don't
23  co-habitate.  And from the time we moved or sold the
24  Piper property, we went separate properties starting
25  with the duplex and I was -- I had Kimball.  And I

Page 23

1  believe that's when I changed my form for BPU and it
2  hasn't changed since.
3    Q.    Right.  So you've, since September of
4  2016 until today, you haven't filed an updated
5  Certificate of Residency with BPU, correct?
6    A.    My residency hasn't changed since I
7  filed that paperwork with BPU.
8    Q.    So the answer is yes?
9    A.    Yes.
10    Q.    You haven't filed an updated
11  certificate, correct?
12    A.    I haven't had the need to.
13    Q.    All right.  And I'll show you the form
14  here in a little bit, but part of the form
15  says you're familiar with the BPU residency policy
16  and understand that if you move, you have to file a
17  new Certificate of Residency, correct?
18    A.    Correct.
19    Q.    So, at all times you've been employed
20  at BPU, you've been aware of that requirement,
21  correct?
22    A.    Correct.
23    Q.    And so the only two Certificates of
24  Residency I've seen in your files are the one in 2016
25  identifying the Kimball address and then prior to

Page 24

1  that the Piper address at 122nd in Piper, Kansas,
2  correct?
3    A.    That's correct.
4    Q.    Okay.  So I'm not sure I got a
5  detailed enough answer.
6        So, it's your testimony that from 2016
7  until today, you've been living at the Kimball
8  address?
9    A.    Yes.  That's my legal residence.
10    Q.    And you're qualifying that.  You're
11  saying your legal residence.  What does that mean to
12  you?
13    A.    Whatever the government says is my
14  legal residence.
15    Q.    Okay.
16    A.    And...
17    Q.    Do you sleep there?
18    A.    I do.
19    Q.    Every night?
20    A.    No.
21    Q.    How many nights of the week would you
22  say you sleep at the Kimball address?
23    A.    When I'm at work.
24    Q.    Where else do you sleep?
25    A.    Out at the Stillwell on my off days.

Page 29

1  BPU?
2      A.   Yes.
3      Q.   All right.  And so contained within
4  this handbook is the residency requirement, correct?
5      A.   I haven't read it.
6      Q.   Okay.  So let me have you look at
7  Page 5.
8          MR. BRAUD:  Are you talking about the
9  Bates number or the page document?
10         MR. DENK:  Well, fair enough, I was
11  quoting to the page number of the document.
12         MR. BRAUD:  Okay.
13  BY MR. DENK:
14      Q.   But it is BPU 11.  So there's,
15  Mr. Owens, in the right-hand corner, there are
16  numbers that say "BPU" and then there's, you know, a
17  number at the end, we refer to those as Bates
18  numbers.
19      A.   Okay.
20      Q.   So your attorney's made a good point
21  that, for purposes of clarity, we should probably
22  refer to the Bates number.
23         So at Exhibit 1 at BPU 11,
24  Section 1.09, there is, it's identified and it goes
25  all the way over to BPU 13, there's a statement in

Page 30

1  here identifying and describing what the residency
2  requirement is.  Correct?
3      A.   Uh-huh.
4      Q.   Yes?
5      A.   Yes.  I'm sorry.
6      Q.   That's okay.  And that's one of the
7  other rules I should have gone over with you is we
8  need verbal responses, so uh-huhs and huh-uhs, she
9  can't really pick that up on the transcription.  So
10  if you can, you know, give me yes and noes and verbal
11  answers, that would be appreciated.
12         (Owens Exhibit 2 was marked for
13  identification.)
14  BY MR. DENK:
15      Q.   So I'm also handing to you what's been
16  marked as Deposition Exhibit No. 2.  And this
17  is -- do you recognize that as the Certificate of
18  Residency that you executed?  And there's a file
19  stamp date of September the 21st of 2016 on it and
20  you also dated the form yourself September the 21st
21  of 2016, correct?
22      A.   That's correct.
23      Q.   Okay.  And this Deposition Exhibit No.
24  2, you completed this form, correct?
25      A.   Correct.

Page 31

1      Q.   And within the form, you state in
2  Paragraph 1 that you are residing at the Kimball
3  address, correct?
4      A.   Correct.
5      Q.   You, additionally, indicate that in
6  Paragraph 2 you've read and you're familiar with the
7  residency requirement and that you must comply with
8  the residency requirement throughout the tenure of
9  your employment at BPU?
10         MR. BRAUD:  For clarification, it
11  says, "I have read or am otherwise familiar with."
12         MR. DENK:  Okay.
13  BY MR. DENK:
14      Q.   You've known at all points in your
15  career you were required at BPU to live within
16  Wyandotte County, correct?
17      A.   Yes.  And, like I stated, I've never
18  read this, but I am kind of familiar with it.
19      Q.   Okay.  You then in Paragraph 3 attest
20  that you understand that BPU will actively
21  investigate residency policy complaints and you will
22  be immediately terminated from employment if found to
23  be in violation of the employee residency
24  requirement, correct?
25      A.   Yes.

Page 32

1      Q.   Well, let me ask, when you signed
2  this -- I mean, you signed it, you put your name on
3  it, right?
4      A.   Yes.
5      Q.   What was your understanding of what
6  the residency requirement required?
7      A.   That majority of my time spent off
8  work hours was at the 3211 Kimball.
9      Q.   And do you feel that at all relevant
10  times from 2016 to the present that that's been true?
11      A.   For the most part, yes.
12      Q.   But you acknowledge that you do spend
13  time at the Stillwell address, correct?
14      A.   I do go out there, yes.
15      Q.   You do sleep out there sometimes?
16      A.   I have, yes.
17      Q.   But you didn't think it was important
18  for you to actually read what the residency
19  requirement actually requires; is that your
20  testimony?
21      A.   Yes.  My understanding was majority of
22  time spent at my residence is what I understood.  I
23  didn't --
24      Q.   How did you come to that
25  understanding?

Page 33

1    A.    That's just always what I've heard.
2    Q.    And so when you decided that it was
3 okay to go out to the Leavenworth County address and
4 spend time out there and sleep out there, you didn't
5 think it was important to actually read the residency
6 requirement, even though you signed a Certificate of
7 Residency saying you could be fired for violating it?
8         MR. BRAUD:  Object to the form.
9 Argumentative.
10    A.    I didn't see any issues with it.  I
11 mean.
12 BY MR. DENK:
13    Q.    But you --
14    A.    It's the same as if I had a girlfriend
15 and I stayed home and I stayed and went and spent the
16 night with her, I mean, it's the same thing.  Who's
17 to say I can't -- I have to stay in one house all the
18 time.  That's the part I --
19    Q.    But I think my question was, is even
20 though you were doing that, you didn't even bother to
21 go read the residency policy, true?
22    A.    I didn't feel like I had to.  I feel
23 like I was within the legal rights of having -- it
24 was a legal residence and I was there.
25    Q.    Okay.  And you signed a form in 2016.

Page 34

1 I mean, there's a reason they have you sign this, you
2 acknowledge that, right?
3    A.    Yes.
4    Q.    I mean, they have you sign this
5 because they think it's important that you know
6 what's in this form.  Would you agree with that?
7    A.    I agree.
8    Q.    And in this form, they're telling you
9 if you are violating -- No. 1, they're having you
10 attest that you have either read or you are otherwise
11 familiar with the policy, correct?
12    A.    Yes.
13    Q.    And you're telling me today you can't
14 tell me the ins and outs of the policy?
15    A.    No.
16    Q.    Okay.  So you weren't otherwise
17 familiar with the actual requirements of the policy,
18 agreed?
19    A.    I'm just familiar with what a legal
20 residence is.
21    Q.    You didn't answer my question.
22         You were not otherwise familiar with
23 what's required of the policy?
24    A.    I didn't read it.
25    Q.    Right.  And you can read through it

Page 35

1 here, nowhere in this policy -- have you read it
2 since?
3    A.    No.
4    Q.    You've never read it?  Even though you
5 were under investigation for violating the policy, to
6 this day, you still haven't read the policy?
7    A.    No, because I still don't feel like
8 I'm wrong.
9    Q.    Okay.  There are other work rules that
10 you operate under at BPU, right?
11    A.    That's correct.
12    Q.    There are other things that you can do
13 at the BPU, other work rules you can violate and be
14 fired for, correct?
15    A.    That's correct.
16    Q.    You're a lineman, so there are hard
17 and fast safety rules that you have to follow, and if
18 you don't, you can be disciplined or fired, correct?
19    A.    That's correct.
20    Q.    So, for example, if you're up in the
21 danger zone of power lines, you need to be wearing,
22 you know, insulated gloves and sleeves, correct?
23    A.    That's correct.
24    Q.    And if you don't do that, you can be
25 fired, right?

Page 36

1    A.    I've never seen it happen at BPU.
2    Q.    Okay.
3    A.    It's not --
4    Q.    You can be disciplined?
5    A.    You can.
6    Q.    Okay.  And I take it you've
7 familiarized yourself with those rules, right?
8    A.    Yes.
9    Q.    And, in fact, you know, you had to
10 familiarize yourself with those rules as part of your
11 employment.  I mean, that's a safety rule, right?
12 You have to do that so you're safe.
13    A.    That's correct.
14    Q.    But it's your testimony the residency
15 requirement is also a work rule, right?
16    A.    That's correct.
17    Q.    But you have never familiarized
18 yourself, even to this day, even though you were
19 under investigation?
20         MR. BRAUD:  Object to the form.
21    A.    I didn't feel I had to.
22         MR. BRAUD:  Mischaracterizes his
23 testimony.
24 BY MR. DENK:
25    Q.    Have you ever read it?



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 37

1    A.    I told you I have not.
2    Q.    Take time now.  I want you to take
3  time now and read through it and show me where it
4  says that you're in compliance with the residency
5  policy if you spend a majority of your time at a KCK
6  residence.
7         MR. BRAUD:  To the extent you're
8  asking him for a legal conclusion about the document,
9  I'll object on that basis.
10         MR. DENK:  It's not a legal
11  conclusion.  He said his understanding of the
12  residency requirement was that he spend a majority of
13  his time.
14    A.    But where does it say I'm not in
15  compliance.
16  BY MR. DENK:
17    Q.    I don't know.  You haven't read it,
18  right?
19    A.    Right.
20    Q.    So, where does it say in here -- I
21  mean, you attested, right?  You signed this form that
22  you read it or were otherwise familiar with the
23  requirements of the policy.
24    A.    Uh-huh.
25    Q.    True?

Page 38

1    A.    I'm familiar.
2    Q.    How are you familiar if you don't know
3  what it says?
4    A.    Familiar is that I know that I'm
5  supposed to reside in Wyandotte County.
6    Q.    And your testimony was your
7  understanding of residing in Wyandotte County was you
8  spend a majority of your time at a Wyandotte County
9  address, right?
10    A.    That's correct.
11    Q.    So I'm asking you to read it and point
12  to me where, your understanding of the residency
13  requirement, where that's reflected in the actual
14  policy?
15    A.    I don't know.
16    Q.    Okay.  Do you not think it's important
17  that you know what the residency requirement is?
18    A.    Not when I live in the county.
19    Q.    You're saying you live in the county,
20  but you acknowledge that you spend nights at a
21  residence in Leavenworth County?
22    A.    Where is that illegal?  I don't -- I
23  don't get it.  I really don't.
24         MR. BRAUD:  Just answer his question
25  yes or no.

Page 39

1    A.    Repeat the question.
2  BY MR. DENK:
3    Q.    You're saying you live in the county,
4  but you're acknowledging that you sleep out at the
5  Stillwell address sometimes?
6    A.    On occasions.
7    Q.    Okay.  Was your general understanding
8  of the residency policy that if you ever moved or
9  changed your residence, that you were required to
10  complete a new Certificate of Employee Residency and
11  file it with HR?
12    A.    Yes.
13    Q.    Okay, well, let's go ahead and look at
14  the residency requirement.
15         So in the second paragraph, it
16  says --
17    A.    Where are we at?
18    Q.    1.09, BPU 11, Bates number.
19    A.    Okay.
20    Q.    The second paragraph says, "Pursuant
21  to the BPU's residency policy, all BPU employees
22  shall establish and maintain their legal primary
23  residence within the legally defined boundaries of
24  the Unified Government of Wyandotte County, Kansas
25  City, Kansas, throughout the period of their

Page 40

1  employment, and shall not attempt to circumvent the
2  objectives of the employee residency requirement."
3         Do you see that?
4    A.    Yes.
5    Q.    Then in the next paragraph, it again
6  states that you're required to establish your primary
7  residence within the Unified Government.
8         And then do you see where about the
9  fourth line down it says, "provided that if at any
10  time such employee changes his or her place of
11  permanent residence, such employee shall be required
12  to establish" -- oh, I'm sorry this is the
13  grandfather clause.
14         You were not employed by the BPU prior
15  to July 20th of 1983, were you?
16    A.    No.
17    Q.    Okay.  So the next paragraph indicates
18  that you've got 12 months to establish residency.
19  And so if I understood your testimony, you did that
20  when you lived at the 122nd Street address, correct?
21    A.    That was when I was hired, yes.
22    Q.    Okay.  And then it says on or before
23  the last day, you have to complete the Certificate of
24  Residency.
25         And then it indicates that any

Page 49

1    A.    Yes.
2    Q.    Okay.  And if we look back to prior
3  years, I'm assuming that probably just increased
4  incrementally probably by the wage increase rate of
5  3 percent.  So, roughly, if we go back all the way
6  back to '15 or '16, it would be maybe in the 140
7  range, something like that?
8    A.    Maybe 130.
9    Q.    Okay.  How much money did you make
10  from Owens Electric last year?
11    A.    I don't recall.
12    Q.    Can you give me an estimate?
13    A.    Not really.
14    Q.    How about the year before?
15    A.    It would be in my tax statements, I
16  don't know.
17    Q.    How many hours on average a week are
18  you working through Owens Electric?
19    A.    It just depends.  Usually when I leave
20  BPU, I work another 6 to 8 hours.  Just depends on
21  what jobs I have coming up.
22    Q.    Okay.  And what do you bill your time
23  at Owens Electric at?
24    A.    I bill by the job.
25    Q.    So you don't have an hourly rate?

Page 50

1    A.    No.
2    Q.    Are you making more money through
3  Owens Electric than you are through BPU?
4    A.    I don't think so.
5    Q.    Is it close?
6    A.    I don't know.
7    Q.    Are you making $100,000 a year through
8  Owens?
9    A.    I don't think so.
10    Q.    Do you think your total compensation
11  last year or income was more or less than $250,000?
12    A.    I don't recall.
13    Q.    You couldn't guess?
14    A.    No.
15    Q.    If I said you made $250,000, would
16  that jump out at you as patently false?
17    A.    Probably.
18    Q.    How about 225?
19    A.    I don't know.  I don't think so.
20    Q.    Okay.  And what does your wife make
21  working at Anderson?
22    A.    Oh, this year would have been 100, but
23  previously 60s.
24    Q.    Why was it more this year?
25    A.    I guess she got a raise.

Page 51

1    Q.    Pretty good raise.
2    A.    Family.
3    Q.    Yeah.  Okay.  So if we went back to,
4  you know, 2015-2016 time frame, you're thinking she
5  was making about 60,000?
6    A.    Roughly, yes.
7    Q.    Okay.  Does she work full time at
8  Anderson?
9    A.    Yes.
10    Q.    Is that 40 hours a week or more?
11    A.    More.
12    Q.    And then at the Stillwell address,
13  let's go back in time.  Let's start with today.  Who
14  of the four kids today resides at the Stillwell
15  address?
16    A.    Tyler, Sterling and Alexis.
17    Q.    All right.  So we're in January of
18  2022.  How about throughout 2021?  Which of the kids
19  lived there?
20    A.    I believe Tyler and Alexis.
21    Q.    How about 2020?
22    A.    Should have been Tyler and -- I'm not
23  sure.  It would be Tyler and Alexis the whole time,
24  and Sterling moved out, I'm not sure the period of
25  time.

Page 52

1    Q.    Okay.  And so when you say the whole
2  time, are you going back to 2016?
3    A.    Yes.
4    Q.    And the building permit for the
5  primary residence at Kimball was pulled from the City
6  in 2016, correct?
7        MR. BRAUD:  Kimball or Stillwell?
8  BY MR. DENK:
9    Q.    Stillwell.
10    A.    I believe so.
11    Q.    And that permit was good for 1 year,
12  correct?
13    A.    I don't recall.  I believe so.
14    Q.    Was the primary residence constructed
15  within 1 year from when the permit was pulled?
16    A.    I believe so.
17    Q.    Since that time, you've built a fairly
18  substantial 3-cars detached garage with and it looks
19  like there's even maybe some living space above the
20  detached garage; is that fair?
21    A.    That's fair.
22    Q.    Okay.  And that was constructed when?
23    A.    Within the last 2 years.
24    Q.    Okay.
25    A.    I believe.

STERLING OWENS vs                                DEPOSITION OF STERLING M. OWENS
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY                             January 20, 2022

Page 53

1      Q.    Do you recall whether you pulled
2   permits for that after this residency investigation
3   had already taken place?
4      A.    I don't recall when I pulled the
5   permit for it.
6      Q.    Okay.  Did you build it yourself?
7      A.    I contracted it.
8      Q.    Okay.
9      A.    I mean, I was the general contractor.
10     Q.    How about the primary residence?  Who
11  was the contractor on that?
12     A.    Pete St. Peters.
13     Q.    Is he an established builder?
14     A.    Yes.
15     Q.    How much acreage do you have out
16  there?
17     A.    Just under six.
18           MR. BRAUD:  I'm sorry, you said?
19           THE WITNESS:  Under six.
20           MR. BRAUD:  Just under six, okay.
21  BY MR. DENK:
22     Q.    Have you kept horses on that property?
23     A.    No.
24     Q.    So one of the pictures in the
25  residency investigation showed some horses.  Are

Page 54

1   those not yours?  Or not on your property?
2      A.    Not mine.
3      Q.    Were they --
4      A.    No, not on the property either.
5      Q.    Okay.  Are there horses on some
6   adjacent property to yours?
7      A.    Pretty much on two sides.
8      Q.    Okay.  So let me have you turn to in
9   Exhibit 3, turn to the second page which is BPU 158.
10           So there are three pictures on BPU
11  158, the top, do you recognize that as the Chevy
12  Silverado that we've been talking about?
13     A.    Yes.
14     Q.    Okay.  And then is that also the
15  Silverado in the second picture down?
16     A.    It's the Sierra.
17     Q.    Oh, the Sierra, okay.  So Silverado's
18  on top --
19     A.    No, Sierra both.
20     Q.    Oh, the Sierra both, okay.  So both
21  the first and second pictures are the Sierra?
22     A.    Yes.
23     Q.    All right, I'm sorry.
24           And then the third picture down is
25  your white panel van, correct?

Page 55

1      A.    Yes.
2      Q.    Okay.  Do you recognize the residence
3   depicted in the second and the third picture as the
4   Stillwell residence?
5      A.    I do.
6      Q.    Then turning to the next page, BPU
7   159, there's a picture at the top of that page, then
8   there appears to be a picture of the gray Mitsubishi
9   Eclipse that I think we have identified as your
10  wife's; is that correct?
11     A.    Yes.
12     Q.    What's the white, looks like an SUV
13  behind that?  Do you know whose car that is?
14     A.    That's Alexis's car.
15     Q.    And is that registered to Alexis?  Or
16  do you know?
17     A.    At the time, it wouldn't have been.
18     Q.    Who was it registered to?
19     A.    Possibly Winford Anderson.
20     Q.    So is that your father-in-law?
21     A.    That's correct.
22     Q.    All right.  So then in the middle of
23  the page, it lists the properties that you are
24  identified as the owner of in Kansas City, Kansas.
25           Other than the Kimball address, are

Page 56

1   these all rental properties that you own?
2      A.    Yes.
3      Q.    Okay.  So the Farrow property is also
4   listed there.  I believe you indicated that for some
5   period of time your wife lived at that address; is
6   that correct?
7      A.    Yes.
8      Q.    And what period of time would that
9   have covered?
10     A.    I don't recall, but it's probably
11  documented in the light bill.
12     Q.    In the light bill, okay.
13     A.    Yeah.
14     Q.    There are appraised valuations out to
15  the right of these various properties.  The Kimball
16  address is appraised at $11,203?
17     A.    That's correct.
18     Q.    Do you see that?
19     A.    Uh-huh.
20     Q.    Okay.  How long have you owned the
21  Kimball address?
22     A.    Probably 20 years.  Give or take.
23     Q.    How many square feet is it?
24     A.    I don't recall.  It's the smallest.
25     Q.    How many bedrooms?

Page 57

1    A.    Two.
2    Q.    How many bathrooms?
3    A.    One.
4    Q.    Kitchen?
5    A.    Kitchen.
6    Q.    And living room?
7    A.    Yes.
8    Q.    Anything else?
9    A.    Basement.  Unfinished.
10    Q.    Have any of the children ever resided
11  at the Kimball address?
12    A.    At some point, yes, but I couldn't
13  give you an exact year.  Because I've lived in that
14  address before.
15    Q.    Before what?
16    A.    Actually after I bought it.
17    Q.    Is it fair to say that the kids never
18  resided in that address long enough for you to enroll
19  them in Kansas City, Kansas, public schools?
20    A.    Well, the reason for that --
21          MR. BRAUD:  Just yes or no.
22    A.    Yes.
23  BY MR. DENK:
24    Q.    Okay.  Has your wife ever resided at
25  the Kimball address with you?

Page 58

1    A.    No.
2    Q.    Okay.  So, if I could have you turn to
3  the next page -- well, before we leave this page.
4          So Ms. Torrez, and I've got the record
5  here we can look at it, she notes that you were a
6  registered voter, registered at the time of the
7  investigation at the Farrow address.  Is that
8  consistent with your understanding?
9    A.    I believe so.
10    Q.    Okay.  And so she also notes that the
11  last time that you voted was in 2012; is that right,
12  at least at the time of the investigation?
13    A.    I don't vote much, but probably.
14    Q.    Okay.  And so just going back, so in
15  2012, I think you indicated that when you started
16  with BPU, you were at the 122nd Street address; is
17  that right?  Or did you move there after you started?
18    A.    No.  I lived there when I started at
19  BPU.
20    Q.    Okay.  So then before the 122nd Street
21  address in November of 2012, did you live at the
22  Farrow address?
23    A.    No.  Me and my wife lived at the 2812
24  North 27th Street address.  Just a couple blocks over
25  from the Kimball address.

Page 59

1    Q.    All right.  So let me have you turn to
2  the next page.
3          Have you looked at any of the records
4  that have been produced in this case relating to the
5  surveillance that was conducted on you?
6    A.    Not much of it, no.
7    Q.    Okay.  So and I'm just going to go
8  through these various days.  The first date of
9  surveillance is August 30th of 2019.  And the picture
10  at the bottom of page BPU 160, that's a picture of
11  the Kimball address; is that correct?
12    A.    That's correct.
13    Q.    So on this date, your vehicle which
14  you indicate is what you usually drive to and from
15  work, the white utility van, he places at the
16  Stillwell Road residence.  Do you see that?
17    A.    I do.
18    Q.    Okay.  And so I think your shift times
19  jump around a little bit here, but he notes -- just
20  so I understand, you were an electric troubleman; is
21  that right?
22    A.    Yes.
23    Q.    Okay.  And so did you sometimes
24  work -- so the troublemen, my understanding, is there
25  will be a couple troublemen on duty when not during

Page 60

1  the regular, you know, 7 to 3 or 8 to 4 working
2  hours, depending on whether you're on summer hours or
3  not.
4    A.    It's 24 hours a day --
5    Q.    Right.
6    A.    -- 7 days a week, holidays.
7    Q.    Right.  So, if there's an issue that
8  pops up during non-regular work hours, then the
9  troublemen can respond to it?
10    A.    That's on shift, yes.
11    Q.    Okay.  And by "shift," you're talking
12  about shift work meaning --
13    A.    Whoever was there at the time of the
14  call.
15    Q.    Right, okay.  So on this date, it
16  indicates that, Ms. Owens [sic] investigation
17  indicates, that you clocked out at about 5 AM?
18    A.    That wouldn't be correct.
19    Q.    Okay.  So you would have, if that was
20  true, you would have come in at maybe, what, 9:00 at
21  night, something like that?
22    A.    There is no shifts that end where I
23  clock out on the five.  I would be clocking out at
24  six.
25    Q.    Okay.  And then she notes that you

Page 69

1  BY MR. DENK:
2       Q.   So if the investigator at the time
3  that he sees your white panel van places you at the
4  Bonner residence during the first round of
5  surveillance nine times, no, 10 times, and at the
6  Kimball residence only twice --
7       A.   Uh-huh.  Yes.
8       Q.   -- do you think it's unreasonable for
9  them to conclude, meaning the BPU, to conclude that
10  there's a potential residency violation?
11      A.   I do.
12          MR. BRAUD:  Objection.  Calls for
13  speculation as to what they considered to be
14  reasonable.
15          MR. DENK:  Well, it's his allegations
16  in the case, Bert, that he felt he was being harassed
17  because they did two rounds of surveillance.
18  BY MR. DENK:
19      Q.   So I want to understand why, based on
20  these facts that were in this investigation, putting
21  you at a Leavenworth County address 10 times and at
22  your Kimball address only twice, why you think it's
23  unreasonable for them to do follow-up investigation
24  based on those facts?
25      A.   Because I also provided them with

Page 70

1  pictures and dates and my camera off the Kimball
2  address.  Who's to say when I'm supposed to be at one
3  address or not.  If I go to Kimball to stay the night
4  and I got pictures and I give it to them.  They have
5  that.
6       Q.   And some of these dates, I mean, you
7  say you haven't looked at these dates -- I mean, you
8  can't even give me a time when you normally would
9  sleep, right?  Is that your testimony?
10      A.   I still can't.
11      Q.   So, if we're trying to figure out when
12  you laid your head on a pillow either at Kimball or
13  Stillwell, you're not even willing to give that to
14  me; is that what I hear?
15      A.   I don't understand that question.
16      Q.   So if I'm trying to look at these
17  times on this investigation and I'm trying to figure
18  out where you sleep, you're telling me that you can't
19  give me any time of day that you sleep when you're
20  off the job?
21      A.   I'm telling you with my shift work,
22  and it changes every 3 weeks, no, I can't tell you
23  what time I might sleep.
24      Q.   Okay.
25      A.   Between BPU and Owens Electric and the

Page 71

1  other things that I have going on, no, I don't know.
2  And it's not unheard of me working 100 hours straight
3  at BPU.
4       Q.   Let's go ahead and keep going through
5  these.  I mean, well, I mean, if you haven't reviewed
6  the investigation, I feel compelled to go through it
7  with you to verify what I just said that you were
8  placed at the Kimball address on 10 occasions and
9  only twice at Kimball.
10          Have you gone through the
11  investigation?  And do you contest that you were
12  actually at the Kimball address as reflected in the
13  investigation report?
14          MR. BRAUD:  Well, I don't mean to step
15  on your toes or anything, but you said Kimball
16  several times.
17      A.   You said "Kimball" twice.
18          MR. BRAUD:  And I think you meant to
19  say "Stillwell."
20  BY MR. DENK:
21      Q.   Okay.  So the investigator put you
22  during the investigation, the first round of
23  investigation, at the Stillwell address on 10
24  different dates.
25      A.   Allegedly.  He put my van at the

Page 72

1  Stillwell address.
2       Q.   So --
3       A.   I mean.
4       Q.   -- I'm asking you.
5       A.   I don't know.
6       Q.   You don't know?
7       A.   I don't know.  I don't know where -- I
8  work so much, I couldn't tell you exactly where he
9  could put me.  I just know he was following me on my
10  Owens Electric jobs.  I saw him taking pictures of
11  me.  That's the harassment.
12      Q.   And, I mean, you're saying harassment,
13  but you filed a residency form where you acknowledge
14  that the BPU would actively investigate residency
15  policy complaints, right?
16      A.   At what point does the investigation
17  become too much?
18      Q.   Well, if the first round of
19  negotiations -- or pardon me -- surveillance puts you
20  at a Bonner address on 10 different dates and at a
21  KCK residence only twice --
22      A.   Correct.
23      Q.   -- again, if I understand your
24  position, that is an unreasonable conclusion for them
25  to arrive at that you were in violation of the

STERLING OWENS vs                          DEPOSITION OF STERLING M. OWENS
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY                        January 20, 2022

Page 73

1 residency policy?
2       A.    I don't believe so.
3       Q.    You don't believe so what?
4       A.    No, I mean, I got neighbors at Kimball
5  that all can testify that I'm there.  The
6  investigation is just him taking pictures.  That's
7  not enough.
8       Q.    In your opinion.
9       A.    In my opinion, that's enough, no.
10      Q.    Okay.  So what's the valuation on your
11 Stillwell residence?
12      A.    I'm not sure.
13      Q.    I think some of the records I show
14 showed that it's valued at almost a half million
15 dollars.  Does that sound right to you?
16      A.    Could, yes.
17      Q.    How many square feet is that?
18      A.    2,100 I believe.
19      Q.    And how many garages do you have at
20 that residence?
21      A.    At the moment, six.
22      Q.    Okay.  And then you built the detached
23 3-car garage, right?
24      A.    That's part of the six.
25      Q.    And then is there living space above

Page 74

1  that?
2       A.    Storage space.
3       Q.    Okay.  How many bedrooms?
4       A.    Four.
5       Q.    And your kids, any of your kids who
6  have lived with you from, or who have resided in any
7  of your properties, from 2019 through the present
8  have resided at the Bonner Springs address?
9       A.    All but one.
10      Q.    Okay.  And none of them have resided
11 with you at the Kimball address from 2019 through the
12 present?
13      A.    Not legally.  But Sterling, Junior,
14 has stayed with me at the Kimball address.
15      Q.    And what period of time did that
16 cover?
17      A.    During college.
18      Q.    And he's 24; is that what you said?
19      A.    Uh-huh.  He just recently graduated a
20 year ago I believe.
21      Q.    Okay.  I just want to kind of identify
22 some of these other pictures in here.  BPU 165 is a
23 photo of your white panel van, and the date and
24 timestamp on it is September 3, 2019, at 4:59 PM; is
25 that correct?

Page 75

1       A.    Yes.
2       Q.    Then at 5:46 PM on that same date,
3  there's a picture of the Kimball address.  When you
4  parked at the Kimball address, did you park in that
5  driveway just to the left of the house?
6       A.    Sometimes I parked down in the grass
7  on the side.
8       Q.    And would that be reflected in the
9  picture that I'm seeing here?
10      A.    It would not.
11      Q.    Okay.  So the next photograph is at
12 BPU 166, there's a photograph at September the 6th at
13 10:46 AM, your white panel van is there, correct?
14      A.    Correct.
15      Q.    Next page, I'll just -- if you're
16 telling me the white panel van is the car you
17 normally drive, I'll just ask about that.
18      A.    Okay.
19      Q.    Is that --
20      A.    That's fine.
21      Q.    -- your testimony?
22      A.    Yes.
23      Q.    Okay.  So BPU 168, September 7, 2019,
24 at 7:04 AM, there's a picture of your white panel van
25 at the Stillwell address, correct?

Page 76

1       A.    Correct.
2       Q.    September 7th at 8:50, so same date
3  about an hour and 45 minutes later, your white panel
4  van is still at Stillwell, correct?
5       A.    Correct.
6       Q.    Same date, 11:10 AM, white panel van
7  is still in Bonner, correct?
8       A.    Correct.
9       Q.    Then the bottom picture, BPU 171, then
10 at noon the white panel van is still there, correct?
11      A.    Correct.
12      Q.    Then BPU 172, same date, 1:13 PM, the
13 white panel van is still there, correct?
14      A.    Correct.
15      Q.    Next page, BPU 173, 3:02 PM, white
16 panel van is still there, correct?
17      A.    Correct.
18      Q.    So then the next day, September 9,
19 2019, the white utility van, at least in the
20 narrative, is described as being at the Stillwell
21 residence.  And he took a picture of I believe that's
22 you, although it's dark admittedly, at 7:09 AM
23 walking in the residence.
24            Do you see that?
25      A.    Yes.

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 81

1 a contractor's vehicle?
2      A.    That one with the trailer.
3      Q.    Anderson & Sons, gotcha.  So are you
4 running the contracting business out of the Stillwell
5 address?
6      A.    I'm running the Owens Electric out of
7 the detached garage of the Stillwell.  And I have a
8 business license at that detached garage.
9      Q.    Okay.  So then Ms. Owens in the next
10 portion at BPU 188 through 189, she describes --
11           MR. BRAUD:  You said "Ms. Owens," did
12 you mean Ms. Torrez?
13           MR. DENK:  Ms. Torrez, I'm off my game
14 today, sorry.
15 BY MR. DENK:
16      Q.    Ms. Torrez describes an interview that
17 she conducted with you on November the 4th of 2019.
18 I'm assuming you recall coming in and giving that
19 interview; is that correct?
20      A.    Yes.
21      Q.    Okay.  What do you recall that was
22 asked and said during that interview?
23      A.    I recall her asking me did I -- I
24 believe first she said did I sign the paperwork for
25 the residency.

Page 82

1           And then I can just remember her
2 showing me a picture of Kimball and ask did I live
3 there, and then showing me a picture of the Stillwell
4 and asked me did I own it or live there, and I told
5 her I owned it.
6           And then wasn't long into the
7 conversation, she kind of was almost like she was
8 treating me like I was lying from the start.  She
9 didn't want to hear anything I had to say.  I was
10 guilty as far as she -- the way she seemed.
11      Q.    Okay.  Let me have you review what
12 she's got in here at BPU 188 through 189, and tell me
13 if you agree with the statements that she is
14 attributing to you, whether or not you agree that you
15 made those statements during that interview.
16           MR. DENK:  Let's go ahead and take a
17 break while he's doing that.
18           MR. BRAUD:  Okay.
19           (Recess.)
20 BY MR. DENK:
21      Q.    So, Mr. Owens, before we broke, I
22 asked you to read the description of the interview
23 that Ms. Torrez included in her investigative report.
24           Is there, relative to the statements
25 that she attributes to her and her summary, do you

Page 83

1 agree or disagree that you made those statements
2 during that interview?
3      A.    Partly.
4      Q.    Okay.  What do you --
5      A.    Just the part where I've been
6 separated for 3 years, that's not correct.  I don't
7 know if that's the way I said it or if it came off
8 like that, but me and my wife had been having issues
9 on and off, and I told her I'd provide her with
10 separation papers.
11           I think I did, but they weren't legal.
12 It hadn't gotten that far, it was just kind of a
13 threat.  So that part's not --
14      Q.    A threat from you or from her?
15      A.    From her.
16      Q.    Okay.  Anything else in her
17 description relative to the statements that she
18 attributes to you that you take issue with?
19      A.    Yeah.  I don't recall her asking to
20 provide a timeline of the sale or disposition of the
21 Stillwell property.
22      Q.    Okay.  Anything else?
23      A.    Not that I recall.
24      Q.    Okay.  So one of the statements that
25 she attributes to you is she indicates that she asked

Page 84

1 you whether you lived at the Bonner address, and you
2 said that you did not -- "That I am actually building
3 with the intent to either sell, rent or Airbnb.  I
4 was actually this morning was putting in a septic."
5           Do you acknowledge that you made that
6 statement?
7      A.    And that septic would have been at the
8 detached garage.  I think she assumed that it was at
9 the house and the house wasn't livable is what she
10 probably assumed.
11      Q.    Okay.
12      A.    That's what I took out of that.
13      Q.    Okay.  So you've got a bathroom in the
14 detached garage?
15      A.    I do.
16      Q.    Okay.  Is that in the space above the
17 garage?  Or is that --
18      A.    Yes.
19      Q.    Okay.  So is there living space up
20 there?  I thought you said it was unfinished?
21      A.    It's not finished, but it's possible
22 living space.  I plumbed it.
23      Q.    Okay.  And at any time from when you
24 gave this interview until today, have you ever listed
25 the Stillwell property for sale?

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

Page 85

1    A.    I did.
2    Q.    When was that?
3    A.    I don't recall.
4    Q.    Did you have a listing agent?
5    A.    Yes.
6    Q.    Who was that?
7    A.    Norman Shuterman or something.  I'm
8  not sure.  I can't spell his name.  He's with Reece
9  and Nichols.
10    Q.    Okay.  How long was it on the market?
11    A.    Not very long.  My wife -- it kind of
12  sent her over the edge, and it was during COVID as
13  well, so.  She wasn't being reasonable.  She didn't
14  want people to come in the house because of the
15  COVID.  It just it wasn't going well.  At that point,
16  I knew it's not happening.
17        And, like I said before, I've even
18  showed her a property that was 850,000, something I
19  would have totally thought she would have been okay
20  moving into this house, and she's just she's not.
21    Q.    Okay.
22    A.    I told Tammy that in the second
23  meeting.
24    Q.    So what did you list the property for,
25  meaning price or asking price?

Page 86

1    A.    I believe 750.
2    Q.    Okay.  Then in that same paragraph,
3  she talks about that you parked your vehicles at the
4  Stillwell address because your van was previously
5  broken into and you had police reports to confirm
6  that.
7    A.    Yes.
8    Q.    Okay.  So you acknowledge you made
9  that statement during the interview; is that correct?
10    A.    That's correct.
11    Q.    Did you ever produce those police
12  reports to Ms. Torrez?
13    A.    I did.
14    Q.    And I believe you indicated in your
15  testimony earlier today that tools were stolen from
16  your van; is that correct?
17    A.    Well, he got the tools out the van,
18  but I chased him down and I held the guy there until
19  the police got there, so my stuff was recovered.
20    Q.    Okay.  So was there a police report
21  made for that or no?
22    A.    Yes.  And the guy went to jail.
23    Q.    Do you remember the guy's name?
24    A.    No.
25    Q.    All right.  Then further in the

Page 87

1  paragraph, there's a quote that she attributes to you
2  relative to the Stillwell address, quote, I don't
3  even make this house payment, my wife makes it; is
4  that correct?
5    A.    She does.
6    Q.    She does make the payment?
7    A.    Uh-huh.
8    Q.    Meaning?  I guess I want to try to
9  understand that.  Do you all have separate finances
10  from one another?
11    A.    We have some joint, some separate.
12    Q.    Okay.
13    A.    But she does collect the rent money,
14  so that's part of it, making the house payment.
15        MR. BRAUD:  When you say the rent, she
16  collects the rent money --
17        THE WITNESS:  From the properties.
18        MR. BRAUD:  Or your rental properties?
19        THE WITNESS:  Uh-huh.
20  BY MR. DENK:
21    Q.    What kind of revenue do you generate
22  off those rental properties?
23    A.    Probably -- gees.  I'd have to look in
24  my tax statements.  I mean, they're all done where my
25  Kimball address is and a lot of people don't pay on

Page 88

1  time.  I got two consistent Section 8 that's direct
2  deposit, but I couldn't tell you exactly.
3    Q.    I mean, more --
4    A.    I'd say 50 maybe.
5    Q.    50,000 a year?
6    A.    Just a maybe.
7    Q.    Okay.
8    A.    That's probably a little high.
9    Q.    Okay.  So when you're saying, I'm just
10  trying to understand this, when you're saying you
11  don't even make that payment, your wife makes it, are
12  you saying she writes the check from a joint account?
13  Or she pays it from a separate account that is only
14  in her name that is revenue from her employment?
15    A.    No.  I would have to say that the
16  revenue is from the rentals, which would make it both
17  of ours technically, but.
18    Q.    And the rentals, I guess I understood
19  from Ms. Torrez's report that you were identified as
20  the legal owner of the rentals, not your wife.
21    A.    Well, legally she has to be since
22  we're married.  I can't sign off and purchase or sell
23  anything without her signature.
24    Q.    Okay.
25    A.    As with that house on Stillwell.



STERLING OWENS vs                              DEPOSITION OF STERLING M. OWENS
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY                         January 20, 2022

Page 89

1  Which was a problem.
2      Q.   Okay.  But just so I have clarity on
3  the question, is your wife listed as an owner on any
4  of these residential properties that we see at BPU
5  159?
6      A.   No.
7      Q.   Okay, so.
8           MR. BRAUD:  Are you done with three?
9           MR. DENK:  I might flip back to it.
10          MR. BRAUD:  Okay.  I just noticed you
11  marking others, so.
12          MR. DENK:  Yeah.
13          (Owens Exhibits 4 through 14 were
14  marked for identification.)
15  BY MR. DENK:
16     Q.    So, Mr. Owens, it's my understanding
17  that after or at the time of your November the 4th of
18  2019 interview with Ms. Torrez, there was a request
19  made that you produce various documentation relating
20  to your residency, correct?
21     A.   Yes.
22     Q.    And you referenced that earlier in
23  your deposition that you gave her a bunch of
24  documentation that you felt demonstrated your
25  residency at the Kimball address, correct?

Page 90

1      A.   Yes.
2      Q.   Okay.  So what I wanted to do was kind
3  of go through what some of the documentation that
4  Ms. Torrez collected and had attached as part of her
5  investigation and identify some of these various
6  documents and make sure I have an understanding as to
7  what they are and the relevance and whether or not
8  you gave them to her or she derived them
9  independently.  Okay?
10     A.   Okay.
11     Q.   So the first exhibit that I've given
12  to you is Exhibit 4.  Now, I believe that this
13  reflects utility usage at the Kimball address.
14     A.   Yes.  And this is something that I
15  asked Tammy was she able to look at, and she said no.
16     Q.   Okay.  So, at least as to your
17  understanding as of the time of your interview with
18  her, she didn't have this information as to --
19     A.   That was what I was asking her.  I
20  said can she check my water or my usage, and she
21  said, no, we don't do that.
22          And I know because I work in that
23  department that you can see water usage every hour on
24  the hour when something's used, and she said you
25  couldn't do that.  And I verified with the

Page 91

1  superintendent.
2      Q.   Okay.
3      A.   And now she's showing that.
4      Q.   All right.  And so Ms. Torrez has this
5  here, there's a notation on these spreadsheets as to
6  "average similar customer usage."  Do you, you know,
7  because you've worked at the BPU, do you have any
8  sense as to whether or not your usage at the Kimball
9  address was consistent or inconsistent with what
10  other similar properties would have used?
11     A.    It would have to be a similar property
12  that's one person that's residing there and square
13  footage.  And, I mean, I don't know how you could
14  compare when it's just me there, I'll take showers,
15  flush the toilet and I don't drink tap water.
16     Q.   Okay.
17     A.   But she should be able to see that I
18  flushed the toilet at 3:00 in the morning and she
19  said she couldn't.
20     Q.    And so let me go back to the notes
21  here.  So when you reviewed the summary of the
22  interview, is that referenced in here where you asked
23  her to check the usage?
24     A.   It's recorded.
25     Q.   Okay.  So, Exhibit 4 showing water and

Page 92

1  electric usage at the Kimball address for years 2016
2  through 2019, this is not a document that you
3  produced?
4      A.   No.
5      Q.   Okay.
6      A.   It's a document I asked for and she
7  said she wasn't able to look at.
8      Q.   All right, so Exhibit 5.  This is a
9  police report that was attached to her investigate
10  memo.
11     A.   Uh-huh.
12     Q.    And this appears to be from the
13  location of the offense is at the Kimball address?
14          MR. BRAUD:  Yeah, see, I think --
15     A.   I don't see it.
16          MR. BRAUD:  What I've got on 253
17  appears to be a blank report.
18          MR. DENK:  Right here, 3211 Kimball
19  Avenue.
20          MR. BRAUD:  Yeah, see, mine is just
21  blank.
22          MR. DENK:  No, it's on there.
23          MR. BRAUD:  There it is, okay.  Oh,
24  it's all typed.  Okay, got it.
25          MR. DENK:  Okay.

STERLING OWENS vs                          DEPOSITION OF STERLING M. OWENS
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY                      January 20, 2022

Page 113

1  meeting with Human Resources regarding my residency."
2         Do you see that?
3     A.    Yes.
4     Q.    Do you believe that your email is what
5  you're referencing there?
6     A.    I don't know.
7     Q.    Okay.  The Exhibit 15 references an
8  April 17, 2020, internal complaint raises allegations
9  of discrimination, retaliation by Tammy Torrez.
10        So after you submitted Exhibit 16, was
11 there a follow-up meeting with someone in Human
12 Resources following up on this allegation of -- or
13 this complaint as reflected in Exhibit 16?
14    A.    This is my complaint with Tammy,
15 correct?
16    Q.    Yeah.
17    A.    So I believe after this complaint is
18 when the Tyler came in.
19    Q.    Okay.
20    A.    If I can recall right.
21    Q.    Okay.  So then Mr. Hibler at page BPU
22 92 through 94, Mr. Hibler details what the contents
23 of his interview of you were or was.  And so what I'd
24 like to you to do is read through the bullet points
25 that he's got relative to statements that Mr. Hibler

Page 114

1  attributes to you and see if you believe that
2  anything that he has attributed to you is inaccurate.
3         MR. BRAUD:  Was your question simply
4  limited to his --
5         MR. DENK:  Yeah.
6         MR. BRAUD:  Okay.  I think we've moved
7  on to Dumovich's comments.
8         THE WITNESS:  Oh, okay, I'm sorry.
9         MR. DENK:  I was just asking about
10 your statements.
11        THE WITNESS:  Well, I wasn't done with
12 hers really.
13        MR. BRAUD:  You're looking at Tammy's
14 now.
15        THE WITNESS:  Okay, I'm sorry.
16        (Owens Exhibits 15 through 19 were
17 marked for identification.)
18 BY MR. DENK:
19    Q.    Okay.  So, my question, sorry if I
20 sidetracked you, my question is relative to the
21 statements that he is attributing to you on
22 Exhibit 15 at pages BPU 92 through 94 in the bullet
23 pointed list.  I mean, do you take issue as to
24 whether or not you made any of those statements as
25 are reflected in his report?

Page 115

1     A.    I made those statements.
2     Q.    Okay.  So, third bullet up from the
3  bottom on page BPU 93, there's a note that says,
4  "Owens contends he was informed that additional
5  surveillance activity would not be performed after
6  November 4, 2019, but there are multiple instances he
7  believes he was followed or surveilled after that
8  date."
9         Did I read that correctly?
10    A.    Yes.
11    Q.    Okay.  And your interview occurred on
12 June the 2nd of 2020.  Let me ask you this, let me
13 start with this, who is it that made the
14 representations to you that no additional
15 surveillance would be conducted after November the
16 4th of 2019?
17    A.    I believe it was Dennis.
18    Q.    Okay.  And what was the setting for
19 that?  Was that an in-person meeting?  Over the
20 phone?
21    A.    I believe he told that to Allen Dixon.
22    Q.    Okay.  Were you present when that
23 statement was made?  Or did Allen pass that on to
24 you?
25    A.    Allen passed it on to me.  There was

Page 116

1  the incident I was telling you about where I saw a
2  guy taking pictures of me at a customer's house, and
3  I jumped in the van and followed him and he sped off.
4  And I called Allen and told him that they're still
5  following me around.
6     Q.    Okay.  Then on the next page, BPU 94,
7  the first bullet there says, "Owens indicated he was
8  not subjected to any claimed offensive behavior other
9  than the 'shack' comment referenced above."  And he
10 references that Ms. Torrez referred to the Kimball
11 address as a "shack," correct?
12    A.    Yes.
13    Q.    So did you tell Mr. Hibler on June the
14 2nd of 2020 that you were not subjected to any other
15 offensive behavior other than the "shack" comment
16 from Ms. Torrez?
17    A.    I don't recall.
18    Q.    Is that the way you feel?  That the
19 only offensive behavior you were subjected to was the
20 "shack" comment that Ms. Torrez made to you?
21    A.    Are we talking just Tammy?  Or are we
22 talking --
23    Q.    I'm talking about you've made claims
24 of harassment and discrimination in this case, and
25 I'm trying to understand what you feel is offensive

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 117

1 behavior that you've been subjected to.
2      A.     Really, it's just the fact that they
3 were coming after me to fire me, when Tammy would say
4 that she didn't have any pictures of me or the
5 Kimball address and me at the address or -- and then
6 she said that she wasn't -- they weren't following me
7 again.  It was just -- it was her.  The way she went
8 about it.
9            This is a person that I should have
10 been able to go to in HR and speak with about
11 anything.  When I felt like her being in HR, if you
12 would have heard the recording, it was like she was
13 attacking me.  It seemed more than just an
14 investigation.
15      Q.     Okay.
16      A.     It was intense.
17      Q.     So just so I understand, the offensive
18 behavior you feel that you have been subjected to
19 comes from Ms. Torrez?
20      A.     Yes.
21      Q.     Okay.  And nobody else?  Mr. Dumovich?
22 Do you feel like you've been subjected to any
23 offensive behavior from him?
24      A.     No.
25      Q.     And have you ever heard Ms. Torrez

Page 118

1 make any racially offensive comments?
2      A.     No.
3      Q.     Have you ever heard Ms. Torrez make
4 any comments which leads you to believe she has any
5 racial animus against African-Americans or yourself?
6 Let's start -- that's a bad question.  Let's start
7 with African-Americans.
8      A.     Not that I can recall.
9      Q.     Okay.  How about, I mean, you've
10 identified the manner in which she conducted the
11 interview and the "shack" comment were offensive to
12 you; is that fair?
13      A.     That's fair.  And the fact that she
14 was more -- it was like she was more interested in
15 firing me than to actually take a statement and the
16 proof that I provided.  It was just she just kept
17 coming.  Every little thing was to get me fired.  And
18 she makes a statement that -- go ahead.
19      Q.     No, no, finish.
20      A.     No, go ahead.
21      Q.     Okay.  So, all right, I think I got
22 it.
23            The next bullet down on page BPU 94
24 says, "Owens claims he was treated differently than a
25 former coworker, Marco Aranda, who was provided with

Page 119

1 an extension to comply with BPU's residency policy
2 and was ultimately terminated after he informed BPU
3 he was not going to live within Wyandotte County."
4      A.     That was just the most recent at the
5 time.  But I knew of two others, and I'm not sure how
6 their investigation went and how long it was, but
7 there was two other employees that they didn't even
8 have a residency or a place of residence in Wyandotte
9 County and they continued to work.
10      Q.     Okay.
11            (Owens Exhibit 20 was marked for
12 identification.)
13 BY MR. DENK:
14      Q.     Let me hand you what's been marked as
15 Deposition Exhibit No. 20.  These were some
16 interrogatories that were submitted to the BPU by
17 your counsel.  Exhibit 20 at Page 6, your counsel
18 asks for an identification of all employees from
19 January 1, 2015, through the present who have been
20 investigated for residency violations, and then if
21 found in violation, whether the employee was
22 disciplined because of said violation.
23            And then it's got a spreadsheet going
24 two pages of 26 different individuals who have been
25 investigated, and four of those 26 who have been

Page 120

1 terminated.
2      A.     Okay.
3      Q.     Let me ask you this, has your counsel
4 provided these answers to you so that you've seen
5 this list previously?
6      A.     I don't recall.
7      Q.     So, looking at this list, do you know
8 any of these people on this list?
9      A.     I know the few that got fired,
10 Yulondia Davis.
11      Q.     She wasn't terminated for residency
12 though.
13      A.     No.
14      Q.     Yeah.
15      A.     Johnell Walton.
16      Q.     And he was not terminated, right?
17      A.     Yes, he was.
18      Q.     Not for residency.
19      A.     No.  But, to me, it looks like when
20 they're ready to fire someone, they take different
21 avenues, as far as residency, multiple UAs.  And just
22 it's these are people that I feel like has been
23 targeted, especially Johnell Walton.  I worked in the
24 same department with him.
25      Q.     Let me ask you this, so the way I

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 121

1 counted up, I mean, there are -- of the people who
2 were terminated, there are two Caucasian people, one
3 African-American, one Asian. Are you aware of
4 anybody else who's been fired for residency in the
5 past 5 years?
6     A.    Tammy Torrez.
7     Q.    Okay. And she's Hispanic, right? Do
8 you know if she was terminated or whether she
9 resigned?
10    A.    Just the rumors of being terminated.
11    Q.    Anybody else?
12    A.    What was the question?
13    Q.    Are you aware of anybody else that, to
14 your understanding, was terminated because of
15 violation of the residency policy, other than Phil
16 Musser, Judy Woodruff, Denise Duncan, and I'm going
17 to mess that name up --
18    A.    Just like with Allen Dixon, he's one
19 of the ones that I know had never lived in the county
20 and he didn't get fired. And he's white.
21    Q.    Well, he doesn't work for the BPU
22 anymore, right?
23    A.    That's because he got a job with the
24 union.
25    Q.    Okay. And you say you know he doesn't

Page 122

1 live in Wyandotte County --
2     A.    Everyone knew that he didn't live in
3 Wyandotte County while he worked at BPU.
4     Q.    And --
5     A.    I knew that before I knew Allen.
6     Q.    So he doesn't -- you don't even know
7 whether he had a situation like yours --
8     A.    Possible.
9     Q.    -- where he's got a residence, an
10 $11,000 house at 32nd and Kimball, and he's living in
11 a half-million dollar house somewhere else not in
12 Wyandotte County? You don't know whether his
13 situation was like yours or not?
14    A.    I spoke with Allen because he's my
15 union steward, and he told me, he said, I never lived
16 in the county.
17    Q.    Okay.
18    A.    And, obviously, it's on here that they
19 investigated him. And he told me that he never lived
20 in the county.
21    Q.    Okay. Do you know whether he ever
22 attested that he lived in the county or not, whether
23 he signed one of these certificate of --
24    A.    I'm sure he did.
25    Q.    Do you know whether multiple people

Page 123

1 have reported to BPU that they don't think that you
2 live in the county?
3     A.    I don't know.
4     Q.    So you'd agree with me that the
5 people, we've gone over the terminations, but the
6 people who have been investigated, there are white
7 people, there are black people, there are Asian
8 people, there are Hispanic people?
9     A.    And half the black people on here has
10 been fired, even if it wasn't for residency.
11    Q.    Okay.
12    A.    And Tammy Torrez is not full Hispanic,
13 she's half white.
14    Q.    Okay. But you would agree with me
15 that, at least in terms of residency, you've got all
16 different races that are reflected --
17    A.    Uh-huh.
18    Q.    -- on both investigations and
19 terminations, agreed?
20    A.    Yeah. Yes.
21    Q.    Okay.
22    A.    Oh, there's another page and here's
23 another black guy right here that's been fired, but
24 not -- I don't know if it was for the residency or
25 not, but they definitely fired him.

Page 124

1     Q.    So looking at Exhibit 16, which is
2 this page (indicating), do you have 16 in front of
3 you?
4     A.    Yes.
5     Q.    So, in 16, and this is the April 9,
6 2020, statement that you signed, one of the things
7 that you note in that third paragraph, you say, "I
8 have enclosed rental lease agreement, receipts of
9 rental payments received with supporting bank
10 deposits and a copy of license application."
11    A.    Yes.
12    Q.    Okay. And so before that you say, "My
13 property located at 17176 Stillwell Road is rented."
14 Correct?
15    A.    Yes.
16    Q.    Okay. And so by that statement in
17 here, was it your intent to show that somebody else
18 was living in the house and you were not? Is that
19 why you put that in here?
20    A.    I put that in there for -- my wife was
21 still living in there. I don't know if I put that in
22 there or not, but she was still living there.
23    Q.    I don't see that in here.
24    A.    But in the meeting after I gave them
25 this stuff, I explained everything that it was meant

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 129

1  is entitled a "Home Occupation Permit Application,"
2  and you have filled it out, Sterling Owens, 17176
3  Stillwell Road, Bonner Springs, Kansas 66012,
4  correct?
5      A.   Yes.
6      Q.   So you are representing on this form
7  that you are going to operate a home occupation at
8  this address?
9      A.   I just wanted something in writing
10  that that's where I store my material and that I
11  would be going out there to get my stuff and I made
12  it legal.  And I also have a business license, I'm
13  pretty sure, at 3211 Kimball.
14      Q.   Okay.  Exhibit 19, this is what
15  Ms. Torrez pulled in terms of your time records for a
16  date range from August the 28th through November the
17  7th.
18          Do you have reason to dispute that
19  this accurately reflects the times and hours that you
20  worked during that span?
21      A.   I'd have to look.
22      Q.   Okay.
23      A.   Like I said, it changes every 3 weeks.
24  I also told Tammy in that meeting that we get called
25  in for overtime and we have to respond in a certain

Page 130

1  amount of time.  And I have photos where I've
2  answered the phone and taken a picture of the time
3  that I clocked in, which would be 10 minutes later.
4  And there's no way that I can make it from Stillwell
5  to work in 10 minutes from the time I answer to the
6  time I clock in.  And I got a few pictures of that.
7          But she could also check that herself,
8  and she wouldn't bother to check.
9      Q.   Okay.
10      A.   And we get called in for overtime a
11  lot.
12      Q.   So Exhibit 18 is a memorandum prepared
13  by Ms. Torrez to Mr. Dumovich, Bates numbered BPU 243
14  to 249, and she is detailing some follow-up
15  surveillance.
16      A.   This is when she said she
17  didn't -- she was not still following me.
18      Q.   Right.  So just looking at the photos,
19  BPU 244, March the 21st of 2020 at 11:03 PM, and that
20  top photo can you identify your white work van in
21  that picture?
22      A.   Yes.
23      Q.   Is that parked in your new detached
24  garage?
25      A.   That is when I was out there -- that

Page 131

1  is when I was out there wiring it.  And I told them
2  that.  I was out there -- actually, I was out there
3  more probably within 2 weeks of this time span, 2 or
4  3 weeks out there every day wiring the inside of it.
5  So I spent more time than that March 21st through the
6  22nd or whatever.  I spent weeks out there wiring
7  that place.
8      Q.   All right.  And so the last page, BPU
9  249 on March the 23rd, 2020, at 11:00 AM, do you see
10  your work van at the Stillwell residence at that
11  time?
12      A.   I do.
13      Q.   Exhibit 21, do you recognize what
14  Exhibit 21 is?
15      A.   Yes.
16      Q.   Is this the communication that
17  Mr. Dumovich sent to you advising you that they could
18  neither substantiate nor disprove your residency in
19  Wyandotte County, so that no disciplinary action
20  would be taken?
21      A.   Yes.
22      Q.   Okay.
23      A.   This is after I hired Bert.
24      Q.   Okay.
25      A.   Because if I hadn't have hired Bert, I

Page 132

1  probably would have been fired by now.
2      Q.   And Mr. Dumovich says, he says, "I
3  apologize for the delay in response, but the issues
4  in the case were very complicated and we wanted to
5  complete the investigation of your complaint against
6  Tammy Torrez before making this recommendation."
7          Do you see that?
8      A.   Yes.
9      Q.   Okay.  And so you made a couple of
10  complaints against Ms. Torrez, first in November,
11  then in April, then Mr. Hibler interviewed you in
12  June.  So there were actually multiple complaints
13  that you made against Ms. Torrez; isn't that correct?
14      A.   Two, yes.
15      Q.   Okay.
16      A.   Well, actually, I did also filed a
17  complaint with the I think it was the EEOC or the
18  Human Rights.
19      Q.   Okay.
20      A.   And they should have received
21  something from them.
22          (Owens Exhibit 22 was marked for
23  identification.)
24  BY MR. DENK:
25      Q.   So, do you recognize what Exhibit 22

Page 133

1 is, Mr. Owens?
2     A.    Looks like a letter I wrote.
3     Q.    Okay.  And was this a document that
4 you prepared on or about November the 11th of 2019 to
5 respond to the residency investigation and the
6 interview that was conducted with you on November the
7 4th?
8     A.    Yes.
9     Q.    Okay.  If I understand Ms. Torrez's
10 report, she actually received this document and the
11 information through Mr. Dixon.
12         Did you give that to Mr. Dixon to pass
13 on?
14     A.    I did.
15     Q.    Okay.  And, again, Mr. Dixon is your
16 union representative?
17     A.    Yes.
18     Q.    So one of the things you say in here
19 is, "My children have since graduated high school."
20         Was your youngest graduated from high
21 school at the time that you wrote this?
22     A.    I don't recall.  Possibly.
23     Q.    Now you've referenced a written
24 statement that you provided earlier.  Is this the
25 written statement you were referring to?

Page 134

1     A.    Yes.  I believe so.
2     Q.    So, in here, I don't see anywhere
3 where you're saying that you believe that the way
4 Ms. Torrez acted during the November 4th, 2019,
5 meeting or the fact that you were being subjected to
6 an investigation of your residency, that you felt
7 that it was harassment or discrimination against you
8 based upon your race.
9     A.    Because, at this point, I was just
10 trying to hurry up and provide them the documents
11 that they asked for just to not prolong and make it
12 look like I was stalling.  I mean, I had all the
13 stuff that I needed to get to them, and, no, I
14 didn't.
15     Q.    Okay.  But you agree with me that --
16     A.    But I was totally offended after that
17 meeting, but I did not -- I did put it in there.
18     Q.    Well, but my question is, is you
19 didn't put in this statement that you
20 believe, let's take the conduct of the interview
21 first, that the way that Ms. Torrez conducted the
22 interview was harassment or discrimination against
23 you based upon your race, correct?
24     A.    Maybe.  But after leaving that
25 meeting, I felt a certain kind of way, and all of

Page 135

1 it's recorded.  And it was intense.  And I did, I
2 felt some kind of way and I might not have put it in
3 writing, but I did, after leaving that meeting.
4     Q.    You felt that way?
5     A.    I felt that way.
6     Q.    But you didn't, in the written
7 statement about it --
8     A.    The written statement.
9     Q.    -- you didn't put it in there, right?
10     A.    Because the written statement was
11 concerning me giving her everything she asked for.
12     Q.    Well, I mean, you do say in here,
13 Ms. Torrez stated that she found it hard to believe I
14 chose to live in the shack on Kimball.  And then in
15 the next paragraph you say:  After more than
16 45 minutes of answering questions, providing
17 explanations, offering proof, and enduring Human
18 Resources professional's derogatory comment and
19 biases opinion, I left our November 4th meeting
20 feeling not only offended but also targeted and
21 misunderstood.  A comment of this nature received
22 from a coworker or management staff is something I
23 would have spoken to HR about.
24     A.    I was more concerned about keeping my
25 job at this point.

Page 136

1     Q.    Okay.  But you will agree with me --
2     A.    I put in there how I felt, exactly
3 what you read of Tammy Torrez's actions, the
4 derogatory comment, her biased opinions and how I
5 felt when I left, that's in there.
6     Q.    Okay.  But you will agree with me that
7 you didn't put in here, you didn't take the next step
8 and say I feel like what happened to me is because of
9 my race, right?  You agree with me that's not in
10 here?
11     A.    It might not be in here, but that's
12 what I felt.
13     Q.    Okay.  And so this report that you
14 made, did you give this to Mr. Dumovich, do you know?
15     A.    I believe that was with the packet of
16 other stuff that I gave to Allen Dixon.
17     Q.    Mr. Dixon, okay.
18         Let me ask you this, I mean, you said
19 you felt -- the way that you felt that you were
20 treated or mistreated by Ms. Torrez, do you feel that
21 that was because of your race?
22     A.    I do.
23     Q.    And why do you feel that way?
24     A.    Because my experience at BPU, I've
25 watched several minorities, since I've been there,

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 137

1  I've watched four, three or four, get fired and I
2  always wondered when was my turn.  And it
3  just -- just the fact of watching minorities get
4  fired.  And then -- I don't know.  I don't know.
5      Q.    So who were those three or four folks
6  that got fired?
7      A.    They fired Johnell.
8      Q.    Johnell Walton?
9      A.    Yes.  And it was his second time
10  getting fired.  So I watched him get fired twice.
11  They fired Yulondia three times I believe.  They
12  fired a Darrelle Hargraves.
13      Q.    Yulondia Davis, correct?
14      A.    Uh-huh.
15      Q.    Is that a yes?
16      A.    Yes.
17      Q.    Okay.
18      A.    Darrelle Hargraves, Darrell Zewalk
19  [phon].  And the one I have a problem with is the
20  one -- because Johnell was in the same department
21  with me and they called him for numerous meetings
22  trying to fire this guy.  And now I'm the only black
23  lineman there.  Johnell was the other, and he's gone
24  now.  But it's like you can see it and you feel it,
25  you know it's there.  And it's obvious.  And I

Page 138

1  just -- I'm, like, here's my turn, it's time for me
2  to get fired.
3      Q.    So, do you know whether Ms. Torrez was
4  involved with any of those four names you just gave
5  me relative to their discipline and termination?
6      A.    I don't know.
7      Q.    Relative to Ms. Torrez, are you
8  familiar with -- do you have any knowledge of her
9  disciplining anyone who is African-American?
10      A.    I was called in to a meeting on my
11  supervisor's behalf and had a meeting with Torrez, so
12  I don't know if it was her trying to fire him or
13  someone --
14      Q.    That's Eric Clark?
15      A.    Yes.
16      Q.    Did Mr. Clark get fired?
17      A.    He passed away.
18      Q.    But he wasn't fired before that; is
19  that right?
20      A.    He was fighting for his job.
21      Q.    How much after you were called in for
22  an interview on Mr. Clark did he pass away?
23      A.    It was a while after.  But, again, I'm
24  sure he seeked legal counsel and he didn't get fired.
25      Q.    He did not get fired?

Page 139

1      A.    No.  Because he was still going
2  through it, but he died before any of it came to an
3  end.
4      Q.    Anything else, any other reason that
5  you have to believe that Ms. Torrez treated you
6  poorly in that interview because of your race?
7      A.    Mainly because she spoke about my
8  residence and where it's at.
9      Q.    As a "shack"?
10      A.    As a "shack."  And pretty much the
11  value of it and where it's located, yes.
12      Q.    And you don't -- we talked about this
13  earlier, you don't disagree with the valuation of
14  that house at about $11,000?
15      A.    That doesn't matter to me.  I've
16  always sacrificed to get ahead as far as I've lived
17  in those properties before.
18      Q.    Okay.
19      A.    And I've lived down there for years.
20  And my mom...
21      Q.    Okay.  I'm just -- I mean, you
22  referenced the value of the property, I'm just trying
23  to understand if you disagree with her comment as to
24  what the true value of that property is.
25      A.    No.

Page 140

1      Q.    Okay.  So, I mean, we looked at the
2  statement from Mr. Dumovich.  You weren't ever
3  suspended or terminated as a result of the residency
4  violation, correct?
5      A.    No.  But I was off FMLA.
6      Q.    Okay, so tell me about that.  When
7  were you off?
8      A.    I don't know the exact dates.
9      Q.    Why were you off?
10      A.    Stress.  Anxiety.  It's almost like
11  depression.
12      Q.    Did you seek any care or treatment for
13  your stress, anxiety and almost depression from a
14  mental health care provider?
15      A.    I did.
16      Q.    Who did you see?
17      A.    Dr. Puls it's in -- it's documented.
18      Q.    Dr. -- what's the last name?
19      A.    Puls.
20      Q.    P?
21      A.    I'm not sure how you spell it.
22      Q.    Where is Dr. Puls' office at?
23      A.    At the Heartland on 109th or 10th and
24  Parallel.
25      Q.    And what kind of -- I mean, is

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 141

1 Dr. Puls a psychologist?  Psychiatrist?  General
2 doctor?  What?
3       A.     General doctor.  And she referred me
4 to another doctor.
5       Q.     Who did she refer you to?
6       A.     I don't remember, but it's documented.
7       Q.     How many times did you meet with this
8 other doctor?
9       A.     Just once or twice.
10      Q.     Do you know whether this other doctor
11 was a psychologist or a psychiatrist?
12      A.     I don't know.
13      Q.     Do you understand the difference?
14      A.     I understand the difference, but I'm
15 not sure which one is which.
16      Q.     And what services did you receive?
17 Meaning, let's start with medications.  Did you take
18 any medications?
19      A.     Yes.
20      Q.     What medications?
21      A.     Just anxiety.  And even my blood
22 pressure had went up.
23      Q.     Do you recall the name of the anxiety
24 medication?
25      A.     It's documented.

Page 142

1       Q.     How long did you take that?
2       A.     Oh, for -- I don't recall.
3       Q.     I mean, was it weeks or months?
4       A.     It was months.
5       Q.     Did the medication help?
6       A.     No.  And I've seen a dermatologist
7 too.
8       Q.     And you associate that with your
9 stress and anxiety?
10      A.     Yes.  I've had patches of my hair
11 falling out.  I don't normally wear my hair this
12 long, but I do now to cover up patches, and it's not
13 from being old.  I got one big one in the back now if
14 you want to see it.
15      Q.     That's okay.  So do I, but I for a
16 different reason.
17      A.     But there, I'm getting patches just
18 random places.
19      Q.     Tell me about what symptoms you were
20 having, what the anxiety was causing in terms of
21 symptoms.
22      A.     I mean, I was just sweating for no
23 reason, just I felt like I was in a movie.  It was
24 just weird.  Everything just didn't seem right.
25 Everything was off.  My body felt off.  And I've even

Page 143

1 experienced weight gain, and, I don't know, it
2 just...
3       Q.     How long were you off on FMLA?
4       A.     I don't recall, honestly.  I just
5 remember being on FMLA and it was during the peak of
6 the COVID when they had shut down the BPU building
7 and I was on FMLA.  That's when they called me in for
8 that second meeting, when the building was shut down
9 and I was off that day FMLA.
10      Q.     Was your FMLA paid?  Meaning, were you
11 off on paid leave?
12      A.     It came off my sick time.  And my sick
13 time, I almost never missed work and it builds up,
14 and if you make it to retirement, you can cash it
15 out.
16      Q.     All of it?  Or up to a certain amount?
17      A.     All of it.
18      Q.     And you're in the bargaining unit,
19 right?
20      A.     Yes.
21      Q.     Meaning, you're covered by the union
22 contract, correct?
23      A.     Yes.
24      Q.     Any other symptoms you can identify
25 that you attribute to your stress and anxiety?

Page 144

1       A.     I haven't had a decent bowel movement.
2       Q.     Anything else?
3       A.     Sleep.
4       Q.     Meaning loss of sleep?
5       A.     Yes.
6       Q.     Okay.
7              MR. DENK:  I think just about done.
8 Just take 5 minutes to confer with Spencer and maybe
9 we can wrap it up.
10             MR. BRAUD:  Sure.
11             (Recess.)
12 BY MR. DENK:
13      Q.     I do have just a couple more questions
14 for you.
15             Let me ask this, so is the only
16 offensive conduct that you experienced as part of the
17 investigation of you the conduct that you experienced
18 from Ms. Torrez?
19      A.     Yes.
20      Q.     So, Mr. Low tells me that you used
21 13 days, or drew down 13 days of sick leave during
22 your FMLA period.  Does that sound about right?
23      A.     Possibly.
24      Q.     Okay.  Did you ever go to HR and
25 request that they credit your sick leave bank back

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY

DEPOSITION OF STERLING M. OWENS
January 20, 2022

Page 145

1  associated with your complaint of harassment and
2  discrimination?
3      A.    At that point, I wasn't communicating
4  with HR anymore.
5      Q.    So the answer is no?
6      A.    No.
7            MR. BRAUD:  No, the answer is "yes."
8      A.    Yes.
9            MR. BRAUD:  Yes, he did not
10  communicate.
11            THE WITNESS:  Sorry.
12  BY MR. DENK:
13      Q.    And then Mr. Low also tells me that
14  immediately after or at the tail end of your FMLA
15  leave, that you took 1 week of bereavement leave.  Do
16  you recall that?
17      A.    Yes.
18      Q.    And what was that associated with?
19      A.    My grandma died, the next -- I might
20  have this wrong, but the first day my grandma died,
21  the next day my dad died and then the next day my
22  aunt died all a day apart.
23      Q.    Okay.
24      A.    And that was in Michigan.
25      Q.    Okay.  So that's when you took the

Page 146

1  bereavement leave?
2      A.    Yes.
3      Q.    And, I mean, was it COVID related?
4      A.    It was the start of COVID, so don't
5  know.
6      Q.    Okay.  And I assume that was stressful
7  for you, caused you anxiety, depression, those
8  deaths?
9      A.    Wasn't real close to my dad.  Didn't
10  really know him.  My aunt was just -- I just needed
11  to attend the funeral.  I had never really been
12  around her either.  It was just my grandma would have
13  been the only one.
14      Q.    Did you spend a lot of time with your
15  grandma growing up?
16      A.    Uh-huh.
17      Q.    Yes?
18      A.    Yes.
19      Q.    Okay.
20            MR. DENK:  That's all the questions I
21  have.  Thank you.
22            MR. BRAUD:  I just have one follow-up.
23            EXAMINATION
24  BY MR. BRAUD:
25      Q.    If you want to mark this as whatever

Page 147

1  the next number is?
2            MR. DENK:  Okay.
3            MR. BRAUD:  That's a copy for you.
4  That's going to be, what, 24?  What are we up to?
5            MR. DENK:  Twenty-three.
6            (Owens Exhibit 23 was marked for
7  identification.)
8  BY MR. BRAUD:
9      Q.    Mr. Owens, I've handed you what we've
10  marked as Deposition Exhibit No. 23, it's Bates
11  numbered PLF-SO 22 through 63 inclusive, a lot of
12  this we've already seen.  If you want to take a look,
13  go through it, is this the complete packet of
14  materials that you provided on November 11th with the
15  cover letter that is Exhibit 22?
16            Let me approach it this way.  As we
17  flip through, I think the first thing that might be
18  new is, it's upside down, well, Bates stamp Page 32,
19  it's upside down, that's the police report of
20  10/26/16, correct?
21      A.    Which one?
22      Q.    It's in the lower left-hand corner --
23  or right-hand corner, I'll just use the last numbers,
24  32.
25      A.    Yes.

Page 148

1      Q.    Okay.  And then 33 is the 10/26/16
2  that mentions the hoverboard that I think we did see.
3      A.    Okay.
4      Q.    And then Page 34 is the January 28,
5  2017, police report.  Is that something that you
6  submitted as well?
7      A.    Yes.
8      Q.    Okay.  And then beginning at Page 36,
9  there's a series of receipts from Sutherland, from
10  there's a journal from Sutherland Lumber, then
11  there's several pages of Sutherland and Spec Building
12  Materials, some invoices from them.
13            Did you give these to Ms. Torrez or
14  someone in HR as well?
15      A.    I did.
16      Q.    Okay.  And what do those pages
17  demonstrate?  What was your purpose in giving those
18  to them?
19      A.    That was to show, and I told them in
20  the meeting that I had construction going on at the
21  Stillwell property.
22      Q.    Okay.  And then I think the rest of it
23  is something that we've already marked as exhibits
24  today.  But, collectively, this is what you gave them
25  in November of 2019?

MCR
METROPOLITAN
COURT REPORTING • LEGAL VIDEO
11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850