# EXHIBIT

# T

STERLING OWENS vs.

UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KC, KS, et al.

DEPOSITION OF TAMMY TORREZ

March 08, 2022



mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800   800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!



WWW.DEPOSPAN.COM

Case 2:21-cv-02185-KHV   Document 60-2   Filed 04/13/22   Page 3 of 6

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KC, KS, et al.

DEPOSITION OF TAMMY TORREZ
March 08, 2022

Page 45
1  handwritten complaint that someone was violating the
2  policy. And, obviously, we never identified who that
3  person was that submitted that complaint.
4       Q.    Is, once a complaint is submitted is
5  there a file opened?
6       A.    Yes.
7       Q.    And what goes into that file on that
8  first day when you open that file?
9       A.    Well, the first thing I do is I look
10 at their current address, and then I'll also check
11 the utility bill, you know, see if the utility,
12 because obviously it's BPU, so check to see the
13 utilities and whose name it is in.
14      Q.    In, in that file that you create,
15 first let me ask, is that a physical hard copy file
16 or something on a computer?
17      A.    It's a physical hard copy file
18 usually.
19      Q.    So, so is there somewhere a, a, how is
20 it stored? I think of file as a manila folder.
21      A.    Correct.
22      Q.    Is that what you're talking about?
23      A.    Yes.
24      Q.    Okay. So is there somewhere a manila
25 folder that has Sterling Owens investigation or

Page 46
1  something like that on it?
2       A.    Yes.
3       Q.    And, and as you can sit here today and
4  recall what all is in that folder?
5       A.    I know that there are the utility bill
6  information, there was information, we ran the
7  background check which pulls the addresses for us,
8  and there was information from the county appraiser's
9  office from Leavenworth County. I'd have to actually
10 look at the file, I mean, and it states in the report
11 what all was used as a source.
12      Q.    Is there a, I'm trying to figure out
13 what the right terminology would be, but a document,
14 a piece of paper that would document the opening of
15 the file, file name, date, person being investigated,
16 that sort of thing?
17      A.    Yes.
18      Q.    What does it look like, because I've
19 not seen anything like that?
20      A.    It was in my office. There's the
21 whole cabinet of investigations.
22      Q.    Is this a form? Did you fill in
23 blanks?
24      A.    A form?
25      Q.    Yes, ma'am.

Page 47
1       A.    No, there's no actual form that gets
2  completed.
3       Q.    Okay. So you get an anonymous
4  complaint. What do you do? What's the first thing
5  you do?
6       A.    I just told you, I look at the
7  address, utility bill.
8       Q.    Before you write anything down?
9       A.    Before I write anything down?
10      Q.    Yes, ma'am. And I'm being very
11 literal. When I say, "what's the first thing you
12 do," I mean literally. You hang up the phone, what
13 do you do? Do you open and get him a blank manila
14 folder --
15      A.    Oh, you're asking if I like actually,
16 I mean, I don't know that there's an actual like step
17 by step, like I do this first and then I do this
18 next. I mean, there's a number of different things,
19 you know, steps that go into that process and all of
20 that stuff does go into that folder. What goes in
21 there first, I don't know that, that there's anything
22 in writing that says this has to go in that folder
23 first.
24      Q.    And that's, Mr. Dumovich told me that
25 there was no written policy on how to do this, but

Page 48
1  I'm just trying to picture in my head, if I open
2  Mr. Owens' manila folder what's the first page I'm
3  going to see?
4       A.    I don't know. I haven't seen that
5  file in, in well over a year.
6       Q.    What would be the first piece of paper
7  generated that goes into that file?
8       A.    The first piece of paper, again, it
9  just depends on, you know, what the, you know, where
10 the source was. That's going to be the first thing
11 that you're going to see is, you know, that
12 information regarding the complaint, like who made
13 the complaint about the residency violation.
14      Q.    So somewhere in Mr. Owens' case there
15 should be a piece of paper that says here's how this
16 started?
17      A.    Well, I think in Mr. Owens' case it
18 actually started with Eric Clark. Eric Clark and
19 myself had a verbal conversation. He had some
20 employees that had indicated that they were, they
21 were upset that they had to abide by the residency
22 requirement and there were other people who were not.
23 And so that's what kind of started that conversation.
24 That conversation led to a conversation with Jeremy
25 Ash.

Case 2:21-cv-02185-KHV   Document 60-2   Filed 04/13/22   Page 4 of 6

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KC, KS, et al.

DEPOSITION OF TAMMY TORREZ
March 08, 2022

Page 53

1  Q.  And then just to be clear, you did not
2  write, "it has been reported that he lives at Bonner
3  Springs address," did you?
4  A.  No, I did not.
5  Q.  All right.  Go forward a couple of
6  pages to what's Bates stamped 339 at the bottom.
7  What is, or who rather is Validity?
8  A.  That is the company that does our
9  background checks.
10  Q.  When you do a background check what
11  options do you have in terms of the scope of the
12  background check?
13  A.  I don't understand what you mean by
14  options.
15  Q.  Well --
16  A.  I mean, they pull the same information
17  for everybody.
18  Q.  That's, well, that's kind of my
19  question.  Can you tailor a search to just ask for
20  certain pieces of information?
21  A.  No.  You can ask for additional
22  information.  Say, for example, you wanted employment
23  history, you could request from Validity that you
24  want employment history.  But this is a generic
25  background that they, that is conducted on everybody.

Page 54

1  Q.  Is it your testimony that in every
2  instance when you do an investigation you get a
3  criminal background check?
4  A.  The criminal background check
5  automatically comes with it.  It's part of the
6  package because it's a package that's set up with
7  Validity.
8  Q.  Does a criminal background check have
9  anything to do with residency?
10  MR. LOW:  I'm going to object to the
11  form, just characterizing this as a criminal
12  background check.  Go ahead.
13  A.  Correct.  I didn't run a criminal
14  background check.  I ran a check of his addresses and
15  you'll see that on page 41 -- or 341.
16  BY MR. BRAUD:
17  Q.  And I'm looking at 339 and it says,
18  "criminal omni search plus seven; criminal county,
19  Kansas, Johnson; criminal county, Kansas, Wyandotte;
20  criminal federal; criminal State of Missouri."
21  A.  Because that's part of the package
22  that you purchase from Validity.  It's an automatic.
23  There's no option to change that.
24  Q.  If you'll look at page 41.
25  MR. LOW:  Page 341?

Page 55

1  MR. BRAUD:  Yes, 341.
2  MR. LOW:  Okay.
3  BY MR. BRAUD:
4  Q.  One of the addresses is highlighted.
5  Who highlighted that, do you know?
6  A.  I imagine it was probably myself if I
7  was the one managing the file.
8  Q.  Okay.  If we go forward to 344 this
9  appears to be a check of dependents and
10  beneficiaries, correct?
11  A.  Correct.
12  Q.  Upper left-hand corner there's a date
13  of September 24, 2019, so this would have been
14  something a little later, correct?
15  A.  Correct.
16  Q.  Go back to the very first page of the
17  exhibit.
18  A.  Where?
19  Q.  The very first page of Exhibit 25.
20  We're back to the e-mail that you sent to Chance
21  Baker.
22  A.  Okay.
23  Q.  Who makes the decision to, whether or
24  not to engage in surveillance of an employee?
25  A.  I was making those decisions.  And I

Page 56

1  was doing it on everybody.
2  Q.  You surveilled everybody?
3  A.  Every case that I, that I was
4  investigating, yes.
5  Q.  And that was just something that is a
6  blanket part of the package you did?
7  A.  Yes.
8  MR. LOW:  While Bert looks, we've been
9  going for an hour.  Are you good or do you need a
10  break?
11  THE WITNESS:  I'm good.
12  MR. LOW:  Sorry, Bert, to interrupt.
13  MR. BRAUD:  Sure.
14  BY MR. BRAUD:
15  Q.  I want to compare names and I haven't
16  done this before so a little bit on the fly here.
17  Look at the answer to question number eight, which is
18  towards the end of Exhibit 20, going back to those
19  interrogatories.
20  A.  Okay.  Which, where are we at?
21  Q.  Keep going.  One more page.  Okay.
22  The question asked is, "Did the investigations
23  include any form of surveillance and, if so, who."
24  And so the answer, it says, I'm about three lines
25  down, "The defendant believes that the following

Case 2:21-cv-02185-KHV   Document 60-2   Filed 04/13/22   Page 5 of 6

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KC, KS, et al.

DEPOSITION OF TAMMY TORREZ
March 08, 2022

Page 85

1  separation agreement is a legal document?
2       A.   Do I believe the separation, again, I
3  answered that, no, I did not believe this to be a
4  legal document.
5       Q.   Okay.  Thank you.
6       A.   Because it had not been filed with the
7  District Court.
8       Q.   The next page, the next series of
9  pages beginning at Bates stamp 33 there's a series of
10 pages that indicate a police report or several police
11 reports.  Do you believe a police report to be a
12 legal document?
13      A.   Do I believe these police reports to
14 be a legal document?
15      Q.   Yes, ma'am.
16      A.   I had, I had never taken that into
17 consideration.
18      Q.   Well, as you have time to consider it
19 today --
20      A.   Yeah.
21      Q.   -- do you consider them to be a legal
22 document?
23      A.   Okay.  So I, I mean, you're just going
24 back and forth as to whether he provided legal
25 documents.

Page 86

1       Q.   Ma'am, please just answer my question.
2  Do you consider --
3       A.   No.
4       Q.   -- the police reports to be legal
5  documents?
6       A.   No.
7       Q.   Okay.  The Leavenworth County
8  residential permit, he had indicated in the meeting
9  of November 4 that he was in the process of building
10 a garage on the Stillwell property, correct?
11      A.   Correct.
12      Q.   Did he provide you with a building
13 permit for that?
14      A.   Did he provide a building permit?
15      Q.   Yes.
16      A.   I think there was something from
17 Leavenworth County.
18      Q.   And he also provided a series of
19 receipts for various vendors from which he was buying
20 supplies, correct, Sutherland Lumber Company, among
21 others?
22      A.   It looks like he's provided a
23 Leavenworth County residential permit.
24      Q.   And then after that there's a series
25 of receipts, correct?

Page 87

1       A.   It appears that way.
2       Q.   And then at page, beginning at page
3  42, and the pages that follow that, there's a series
4  of ring door camera photos, correct?
5       A.   I would have to say no, I don't,
6  cannot confirm that these came from a camera.
7       Q.   What do you think they came from?
8       A.   I don't know.  I can't, I can't tell
9  you that, yes, that they came from a camera or, I
10 mean, the surveillance camera that he says that was
11 posted.
12      Q.   He provided you with these in support
13 of his position, correct?
14      A.   He didn't provide me a photo of the
15 actual camera.
16      Q.   What do you think these were taken
17 with --
18      A.   I have no idea.
19      Q.   -- if not a camera?  Beginning at page
20 48 there's a series of pages that indicate a door
21 being locked and unlocked.  Did Mr. Owens tell you
22 that this was records of him coming and going from
23 the Kimball address?
24      A.   He did say that.
25      Q.   Did you believe him?

Page 88

1       A.   I have no proof that it came from
2  there or somewhere else.
3       Q.   Did you believe him?
4       A.   It didn't matter whether I believed
5  him or not.  There was nothing to show that it came
6  from that address.
7       Q.   Did you believe him?
8       A.   Did I believe him?  No, I did not
9  believe him because, again, there was nothing to show
10 that that came from that address and that information
11 was requested of Mr. Owens.
12      Q.   Did you think that he was providing
13 falsified or otherwise fraudulent documents?
14      A.   I do.
15      Q.   And what makes you reach that
16 conclusion?
17      A.   Because he did not provide the
18 information that I requested.
19      Q.   What did he not provide that you
20 requested?
21      A.   I couldn't confirm that this came from
22 that house.  I asked him to provide information to
23 show that it did.
24      Q.   So the documentation that he provided
25 that is in Exhibit 23 you had in your hands when you

Case 2:21-cv-02185-KHV   Document 60-2   Filed 04/13/22   Page 6 of 6

STERLING OWENS vs
UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KC, KS, et al.

DEPOSITION OF TAMMY TORREZ
March 08, 2022

Page 121

1  criminal background check?
2      A.   Yes.
3      Q.   Mr. Owens' background check was not
4  different than any other employee?
5      A.   No.
6      Q.   Okay.  All right.  Let me ask a better
7  question.  Mr. Owens' background check was not
8  different than any other employee who was
9  investigated for their residency, right?
10     A.   That is correct.
11     Q.   Okay.
12     A.   Again, it's part of the package that
13  we purchased from Validity.
14     Q.   You don't do a different background
15  check for employees based on their race?
16     A.   No.
17     Q.   Okay.
18     A.   In fact, I don't even think that has
19  a, I don't think that's in here.
20     Q.   What I'm saying is --
21     A.   I know it's not in here.
22     Q.   What I'm saying is you don't ask for a
23  criminal background check for a black employee and
24  then a non-criminal check for an Asian or white
25  employee, do you?

Page 122

1      A.   No.
2      Q.   Okay.  We talked a bit about Johnny
3  Vang's investigation.  Do you remember that?
4      A.   Yes.
5      Q.   And you mentioned that Johnny Vang
6  voluntarily provided you a closing agreement for his
7  house in Wyandotte County, right?
8      A.   Yes.
9      Q.   Okay.  Did you, did you know at that
10  time whether or not he owned more than one property?
11     A.   Did I know at that time whether he --
12     Q.   So, yeah.  When Mr. Vang brought that
13  to you was that the only house he owned?
14     A.   He did not own any property.
15     Q.   Okay.  So there wasn't any issue, for
16  example, of Mr. Vang saying, "here's my closing
17  document for a Wyandotte County house," but there's a
18  bunch of other potential places he might be living,
19  right?
20     A.   Well, he was actually residing with
21  another family member at that time.
22     Q.   Okay.
23     A.   At least that's what we were able to
24  identify when we did the check on the BPU bill.
25     Q.   Okay.  So him providing the closing

Page 123

1  document of that house was enough in that case,
2  right?
3      A.   Yes.
4      Q.   In Sterling Owens' case would that
5  have been enough given the fact that he owned 12
6  total properties and one of them was outside the
7  service area?
8      A.   As far as like the closing?
9      Q.   Right.
10     A.   I mean, there are multiple properties.
11  Johnny Vang's case was different because there was
12  only one property that he owned, you know, in that
13  particular area.  Like there was no where else to
14  look for property because --
15     Q.   Okay.
16     A.   -- he had actually relocated to this
17  area and was living with family.
18     Q.   Okay.
19     A.   Yeah.
20     Q.   And I just wanted to differentiate,
21  for example, here Sterling couldn't have just said,
22  "I own the Kimball property," and that was the end of
23  it, right?  There was more complications for
24  Sterling's case than Johnny Vang's case?
25     A.   Yes, because there were so many

Page 124

1  properties.
2      Q.   Okay.  At the beginning of the
3  investigation into Sterling Owens you heard from both
4  Eric Clark and Jeremy Ash that employees were
5  complaining Sterling had violated the residency
6  requirement, correct?
7      A.   Yes.
8      Q.   Okay.  What are their positions at
9  BPU, do you remember, Eric Clark and Jeremy Ash?
10     A.   The, Eric was the supervisor over the,
11  the troublemen, and Jeremy is the, what is it, I
12  don't know what his exact title is.
13     Q.   If I told you superintendent of
14  electric operations would that sound right?
15     A.   Yes.  Yeah.
16     Q.   Okay.  So was Eric Clark Sterling
17  Owens' direct supervisor?
18     A.   Yes.
19     Q.   Okay.  And then Jeremy Ash was then
20  above Eric Clark?
21     A.   Yes.
22     Q.   Okay.  Either way, two supervisors of
23  plaintiff Sterling Owens had heard that Sterling
24  Owens was violating the policy?
25     A.   Yes.