## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STERLING OWENS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 21-2185-KHV |
| | ) | |
| UNIFIED GOVERNMENT OF | ) | |
| WYANDOTTE COUNTY/KANSAS | ) | |
| CITY, KANSAS | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Sterling Owens filed suit against Unified Government of Wyandotte County/Kansas City, Kansas, alleging that defendant discriminated against him based on race, retaliated against him and maintained a racially hostile work environment, all in violation of 42 U.S.C. § 1981.  Pretrial Order (Doc. #50) filed February 8, 2022 at 9.  This matter comes before the Court on Defendant Kansas City Board of Public Utilities' Motion For Summary Judgment (Doc. #51) filed February 22, 2022.  For reasons stated below, the Court overrules defendant's motion.

## Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Liberty Lobby, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2017).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

**Factual Background**

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

Plaintiff is an African American male.  The Unified Government is a municipal corporation organized and existing under the laws of the State of Kansas.  The Kansas City Board of Public Utilities ("BPU") is an administrative agency of the Unified Government.   The Unified Government employs more than 200 employees.  During plaintiff's investigation, Tammy Torrez was BPU's compliance coordinator, and Dennis Dumovich was BPU's Director of Human

Resources.

In March of 2013, BPU hired plaintiff as a lineman.  Plaintiff has worked as a lineman since 2007.  Plaintiff and his wife have four adult children.  Plaintiff and his wife are separated but working on their marriage.

**I.     BPU Residency Requirement**

BPU requires all employees to establish and maintain their "legal primary residence" within the legally defined boundaries of the Unified Government.  BPU's requirement intends the "legal primary residence" to be a "residential dwelling," as authorized under Kansas law, and permanent rather than temporary.  Section 1.09 of the Residency Requirement defines "legal and primary residence" as "the residence where the employee spends the majority of [his] non-work hours."  When interpreting the phrase "the majority of [an employee's] non-work hours," Human Resources considers where an employee sleeps the majority of the time.  The policy, however, states numerous tests for determining a BPU employee's primary residence, including but not limited to "residential address of the employee's driver's license, automobile registration, voter registration, bank accounts, credit cards and legal documents' address provided for the purpose of school enrollment for children living with the BPU employee, address provided on the Certificate of Residency filed with the BPU's Human Resources Division, and any other credible evidence indicating the employees intent to reside at a permanent and primary residence."  Section 1.09 does not state what an investigation might entail other than these tests or explain that the BPU may hire an independent investigator to conduct surveillance.  The policy does not define the number of non-work hours an employee must spend at a Wyandotte County residence.  An employee does not violate the policy by owning property outside Wyandotte County.

The requirement allows each employee a period of 12 months after his employment begins

to establish and maintain his "legal primary residence" within the legally defined boundary.  Any BPU employee who violates the residency requirement is subject to immediate termination and "shall not be entitled to further compensation or benefits."  BPU does not consider, or hold against an employee, the fact that he spends non-work hours outside Wyandotte County for things like "family time or going out to dinner."

Before the end of the 12 months, each employee must file a "Certificate of Residency" with Human Resources.  The Certificate requires the employee's address and an amendment if he subsequently changes his address.  The Certificate also requires a signature acknowledging the continuing residency requirement and that violation of the requirement will result in immediate termination.  On September 21, 2016, plaintiff submitted a signed Certificate of Residency to BPU, providing an address of 3211 Kimball Ave, Kansas City, Kansas ("Kimball property").  Plaintiff had never read the residency requirement but was familiar with its mandates.

Since 2015, BPU has terminated four employees for residency violations: two Caucasian employees, one African American employee and one Asian employee.  BPU has investigated 22 other employees for potential violations in that same time frame: nine Caucasian, eight African American, three Asian and two Hispanic.  More than half of the employees investigated for violations are people of color.  While investigating residency requirement violations, BPU has surveilled six other employees.[1]  In Wyandotte County, 67 per cent of residents[2] are Caucasian, and 22 per cent are African American.[3]

---

[1]     The record does not include the race of those surveilled or how long surveillance lasted.

[2]     Defendant does not cite evidence that the ethnic composition of BPU is different than in Wyandotte County as a whole.

## II.     Plaintiff's Properties

Plaintiff owns 12 properties in Wyandotte County.  He rents out 11 of these properties—all but the Kimball property.  Plaintiff characterizes the Kimball property as his "legal residence."  Plaintiff has owned the Kimball property for around 20 years.  It has two bedrooms, one bathroom, a kitchen, a living room and an unfinished basement.  Plaintiff's children have lived at the Kimball property, but not long enough to be enrolled in the public school system of Kansas City, Kansas.  Plaintiff's wife has never lived at the Kimball property.

In 2016, plaintiff built a 2,100-square-foot house with a six-car garage at 17176 Stillwell Road, Bonner Springs, Kansas ("Stillwell property").  The property is in Leavenworth County, just under six acres and worth almost half a million dollars.  On "off days," when plaintiff does not sleep at the Kimball property, he sleeps at the Stillwell property.  Since 2016, at least two of plaintiff's children have always resided at the Stillwell property.  Currently, three of his children live there.  Plaintiff runs a side business, Owens Electric, out of the Stillwell property.

## III.     Investigation Into Plaintiff's Residency

A residency investigation will always start with a complaint alleging that an employee has violated the BPU residency requirement.  Anyone at BPU can submit a complaint, and BPU will investigate, even if the complaint is made anonymously.  The Compliance Coordinator is responsible for conducting and managing the residency investigation.  The Director of Human Resources is responsible for determining whether an employee had violated the residency requirement.  As the requirement enforcer, Dumovich needed to know and understand the residency policy.

---

[3]     *Wyandotte County, Kansas Quick Facts*, UNITED STATES CENSUS BUREAU, https://www.census.gov/quickfacts/wyandottecountykansas (last visited May 19, 2022).

BPU initiated an inquiry into plaintiff's residency after receiving an anonymous report that his primary residence was in Leavenworth County rather than Wyandotte County.  In July of 2019, BPU ran a background check on plaintiff to determine his potential addresses.  Dumovich testified that in his experience BPU does not routinely request a criminal background check during a residency investigation.  Torrez testified that she requested the same kind of background check on plaintiff as any other employee she investigated for a residency requirement violation.

On July 24, 2019, Torrez took "screenshots" of her file on plaintiff within BPU's internal HR System.   Torrez testified that she could not recall if she first opened the file that day.  On the screenshot of plaintiff's current addresses, emails and instant message IDs, Torrez handwrote "Lives @ Bonner Springs Address in Leavenworth County."  On the screenshot of plaintiff's address history, Torrez only highlighted the Stillwell property in Leavenworth County.

On August 21, 2019, Torrez contacted Chance Baker, the owner of Chief Investigations, to conduct surveillance of plaintiff.  Baker surveilled plaintiff 11 times in 2019, between August 30 and September 27.  Baker followed plaintiff while he was off work and photographed him at his other job.  On September 16, 2019, Baker submitted a report to Torrez.  Based on his surveillance, Baker "confirmed" that plaintiff was living at the Stillwell property and using the Kimball property as a work office rather than a permanent residence.  In his surveillance, Baker observed plaintiff's van at the Stillwell property ten times and at the Kimball property twice.

On November 4, 2019, plaintiff met with Dumovich, Torrez and plaintiff's union representative Allen Dixon to discuss plaintiff's residency.  Until this meeting, plaintiff did not know about the investigation and surveillance.  Torrez asked plaintiff if he signed the Certificate of Residency, which he confirmed.  Plaintiff interpreted the Certificate of Residency and the residency requirement to require that he spend most of his non-work hours at the Kimball address.

Torrez showed plaintiff pictures of both the Kimball and Stillwell properties and asked if he owned or lived in each.  Plaintiff answered that he did not live at the Stillwell property and that he was building with the intent to use it as an investment property.  Plaintiff intended to either sell, rent or Airbnb the Stillwell property.  Plaintiff told Torrez that his wife paid the house payment for the Stillwell property.  He also explained that he parked his cars at the Stillwell property because his car had been broken into at the Kimball property.  During this meeting, Torrez referred to the Kimball property as a "shack."  She testified that she made this reference because of the property's condition.  Dumovich testified that the meeting was "contentious at times."  Both plaintiff and Torrez were upset, so Dumovich had to "step in at points to break it up."  Plaintiff testified that he felt attacked by Torrez.  Plaintiff also testified that he believed that BPU would not conduct surveillance on him after the meeting.

After the meeting, BPU requested that plaintiff provide documentation to verify his residency.[4]  Plaintiff submitted a copy of his driver's license, his voter registration, motor vehicle registrations, bank account information, a draft separation agreement between him and his wife, police reports of break-ins at the Kimball property, security camera footage of him entering the house on the Kimball property and the electronic door lock data from the house.  On November 11, 2019, plaintiff wrote a letter summarizing the documentation which he had provided to BPU and explaining that he was not violating the residency requirement.  Plaintiff's letter explained that the meeting lasted more than 45 minutes, with him answering questions, offering proof and enduring Torrez's "derogatory comment and biases [sic] opinion."  At the end of the letter, plaintiff stated that "he left [the meeting] feeling not only offended but also targeted and misunderstood."

---

[4]      The record is unclear whether Dumovich or Torrez requested that plaintiff provide supporting documentation.

Referencing Torrez's "shack" comment, he said that "[a] comment of this nature received from a coworker or management staff is something I would have spoken to HR about."

Plaintiff sent this letter and the documentation to Dixon, who then forwarded it to BPU. After Torrez investigated plaintiff's residency, she authored a 43-page memorandum to Dumovich summarizing the investigation and plaintiff's documentation.  Torrez did not consider all of plaintiff's documentation to be reliable and testified that she was "absolutely skeptical" of him residing in Wyandotte County.  Torrez stated that she did not consider the police reports from the Kimball property to be legal documents, and she could not discern whether the photographs which he provided came from a Ring doorbell security camera.  She believed that plaintiff had falsified the electronic door lock data because he did not provide information to confirm that it came from the Kimball property.  At the end of the memorandum, Torrez concluded that plaintiff was living at the Stillwell property and therefore violating the BPU residency requirement.

When Dumovich received the memorandum, he was not ready to decide whether plaintiff was in violation of the residency requirement.  Dumovich wanted to give plaintiff more time to list and sell the Stillwell property.  During the meeting on November 4, 2019, plaintiff had told Dumovich that he planned to sell the Stillwell property.  At one point, plaintiff listed the Stillwell property with Reece and Nichols Real Estate.  The exact date the property went on the market is unknown.  Shortly after that, plaintiff took the property off the market because his wife did not want potential buyers visiting the house during the COVID-19 pandemic.  In late November, on plaintiff's behalf, Dixon asked Human Resources for an update about plaintiff's residency investigation.  Torrez responded by saying to expect a response after the Thanksgiving holiday. At that time, BPU had not decided the outcome of the investigation, and Torrez did not provide Dixon or plaintiff a status update.

In March of 2020, Torrez informed Dumovich that she planned to obtain more surveillance before holding a second meeting with plaintiff to get any "status updates." In her correspondence to Dumovich, Torrez wrote, "I will have the investigator document [the Leavenworth County] location and the progress of the addition [plaintiff] claimed to be working on . . . ." When asked about her use of the word "claimed," Torrez stated that she had no idea whether he was or was not adding an addition to the Leavenworth home.

Subsequently, Baker surveilled plaintiff three more times (March 21, 22 and 23). Dumovich testified that it cost BPU more than $7,000 to hire Baker and Chief Investigations to conduct surveillance on plaintiff. He also testified that BPU had never spent that much money to conduct surveillance of other employees while investigating residency violations. Torrez authored another memorandum dated April 1, 2020, updating her investigation report. On April 6, 2020, Torrez emailed plaintiff about meeting on April 9 and asked him to provide documentation on the status of the Stillwell property. The purpose of the meeting, and the second round of surveillance, was to "close the loop" on whether plaintiff had sold the Stillwell property.

At some point, the meeting was moved to April 16, 2020. No one testified about who moved the meeting. After the meeting, plaintiff wrote a second letter to BPU in support of his position that he was not violating the residency policy. He wrote, "I feel targeted and discriminated against when employees have been re-hired who do not and have never lived in Wyandotte County." He stated that he had made numerous requests for updates on the status of his investigation, but no one provided him with answers. He ended the letter by asking for a written response addressing his complaints. Plaintiff also supplied BPU a copy of a rental lease agreement for the Stillwell property and receipts of rental payments received with supporting bank deposits.

A.  <u>Plaintiff Takes Leave Under The Family And Medical Leave Act ("FMLA")</u>

On April 8, 2020, during the investigation, plaintiff ended up taking FMLA leave due to stress and anxiety.  Plaintiff also sought treatment from a medical healthcare provider.  FMLA time is protected unpaid leave.  Dumovich was unaware that plaintiff was on FMLA leave on April 9, 2020.  Dumovich testified that he could not remember if this was why the meeting on April 9 was moved.

BPU allowed plaintiff to use 13 days of sick leave while on FMLA leave so he could continue to receive regular wages.  Plaintiff did not ask Human Resources for a way to be paid while on FMLA leave without using his sick leave.  At BPU, employees can "cash out" unused sick leave upon retirement, up to a certain amount.  Dumovich could not remember the maximum amount of unused sick leave an employee could cash out at retirement, how many hours of sick leave plaintiff had banked or whether plaintiff would hit the cap of sick leave by the time he retired.  While out on FMLA leave, plaintiff's grandmother, dad and aunt died over three days, causing plaintiff to take an additional week of bereavement leave.

B.  <u>Plaintiff's Formal Complaint</u>

On April 17, 2020, plaintiff sent a letter to Dumovich and BPU titled "Formal Complaint." Plaintiff stated: "Following the April 16, 2020 meeting with Human Resources, I would like to file a written formal complaint against Human Resource Employee Tammy Torrez."  Plaintiff stated that Torrez discriminated against and bullied him.  He characterized Torrez's "shack" comment about the Kimball property as a "stereotypical comment" that was "not only offensive but also demonstrate[d] a form of prejudice."  Later in the letter plaintiff stated that "[t]he problem with prejudice is that it often ends in discrimination and or biased treatment of others."  Plaintiff testified that he felt harassed and discriminated against because BPU attempted to fire him and mislead him

about the surveillance.  He also felt that BPU's surveillance of him was harassment.  He stated that Torrez was the only source of harassment from BPU and that he had not complained about any other BPU employees.

Plaintiff also claimed that the presence of a police officer in the meeting on April 16 was a form of "bullying."  In his deposition, Dumovich confirmed that an officer was present but stated that BPU commonly has off-duty officers present.  Dumovich requested that an officer be present because the "prior meeting had been contentious."  Dumovich did not know whether the officer was armed.

C.  Harassment Investigation

On April 21, 2020, Dumovich emailed plaintiff a response to his letter.  Dumovich started his email by stating that BPU takes harassment complaints very seriously and that BPU does not tolerate harassment.  He explained that BPU would investigate in the "near future," but that the investigation would be "conducted by someone outside of the Human Resources Department, so there was no potential for any conflict of interest."

BPU retained Tyler Hibler of Husch Blackwell, LLP, to investigate plaintiff's claims.  On July 22, 2022, Hibler submitted his report regarding plaintiff's internal complaint on April 17, 2020, of race discrimination and retaliation by Torrez.  Plaintiff's complaint alleged that Torrez's comment calling plaintiff's property a "shack" was derogatory and racially motivated, that the length and intensity of the investigation into his residence was racially motivated, that he was subjected to multiple meetings with Human Resources to "intimidate and harass" him and that Torrez kept exculpatory evidence from him (pictures and videos of him at the Kimball property).  As part of the investigation, Hibler evaluated numerous documents and interviewed plaintiff, Torrez, Dumovich, Jeremy Ash (BPU's Executive Director of Electrical Operations) and Baker.

Dixon attended Hibler's interview with plaintiff.  Dixon never contacted Dumovich to say that he felt BPU had harassed, discriminated against or retaliated against plaintiff.

Hibler ended his report by saying that "there [was] insufficient evidence to support a conclusion that [Torrez's] activity was motivated by Owens' race or his complaints to Human Resources."  As a result, he did not find evidence indicating a violation of BPU's Equal Employment Opportunity Policy or Anti-Harassment/Discrimination Policy.  Hibler recognized that the residency investigation was extensive, however, and that Torrez should not have used the phrase "shack" to describe the Kimball property.

### D.  Conclusion Of Plaintiff's Residency Investigation

On September 11, 2020, BPU concluded its investigation and Dumovich emailed plaintiff the results.  Dumovich stated that because BPU could not substantiate or disprove plaintiff's residency, BPU would not take any disciplinary action against him.  Dumovich's email contained an apology for the length of the investigation but explained that he wanted to allow Hibler to complete his investigation before making any recommendation.  Hibler concluded his investigation before September 11, 2020, but Dumovich took an extra two months "to make sure that [BPU] made the right decision."  Dumovich stated that this delay also gave plaintiff as much time as possible to sell the Stillwell property.  Torrez disagreed with Dumovich's conclusion that plaintiff did not violate the residency requirement.

BPU never suspended or terminated plaintiff's employment due to the residency investigation.  Throughout the investigation, plaintiff worked his regular hours without any reduction in pay and without any suspension, discipline or transfer.

E.  Torrez's Residency Issues

Some time during or after plaintiff's residency investigation concluded,[5] Torrez voluntarily left the BPU because she could no longer meet the residency requirement.  Dumovich testified that BPU would have terminated Torrez's employment if she had not resigned.  Torrez falsely represented to her daughter's school that she lived within the school district.  To do so, she falsified a BPU document by using someone else's address.

## IV.  Procedural History

On July 30, 2020, before the end of the residency investigation, plaintiff filed a Charge of Discrimination with the Kansas Human Rights Commission, alleging race discrimination and a hostile work environment.  On August 7, 2020, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") with the same allegations.   On January 22, 2021, the EEOC issued a Notice of Rights.

On April 21, 2021, plaintiff filed suit in this Court alleging race discrimination, hostile work environment and retaliation under 42 U.S.C. § 1981.  Plaintiff alleges that (1) but for his race, BPU would not have accused him of violating the residency requirement and investigated him; (2) after plaintiff complained of discrimination, BPU retaliated against him by ordering another round of surveillance and unnecessarily "kept [him] in limbo" by not making a final decision as to whether he had violated the residency requirement; and (3) BPU subjected plaintiff to a racially hostile work environment through "unwarranted and intense surveillance."  Pretrial Order (Doc. #50) at 9.

## Analysis

Defendant asserts that it is entitled to summary judgment on each of plaintiff's claims.

---

[5]        The record does not state a date when Torrez separated from BPU.

Defendant asserts that it is entitled to summary judgment on plaintiff's disparate treatment claim because (1) plaintiff cannot establish a prima facie case and (2) defendant had a non-discriminatory reason for its actions. Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claim because (1) plaintiff cannot establish a prima facie case and (2) defendant had a non-discriminatory reason for its actions. Defendant argues that it is entitled to summary judgment on plaintiff's racially hostile work environment claim because plaintiff cannot establish a prima facie case. The Court addresses each argument in turn.

## I.      Race Discrimination Under Section 1981

Plaintiff asserts that defendant discriminated against him based on race in violation of 42 U.S.C. § 1981. Specifically, plaintiff alleges that but for his race, BPU would not have engaged in such an extensive, lengthy and unnecessary investigation into his residency. Defendant argues that it is entitled to summary judgment because (1) plaintiff cannot establish a prima facie case of discrimination and (2) it had a non-discriminatory reason for its actions.

The elements of a disparate treatment claim are the same whether brought under Section 1981, Section 1983 or Title VII. Mann v. XPO Logistics Freight, Inc., 819 F. App'x 585, 594 n.15 (10th Cir. 2020); Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011). Section 1981 protects employees from racial discrimination both in entering an employment contract and enjoying the benefits, privileges, terms and conditions of employment. Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004). Under Section 1981, disparate treatment claims involve "a situation where the employer simply treats some people less favorably than others because of their race, color, religion or national origin." Drake v. City of Fort Collins, 927 F.2d 1156, 1159 (10th Cir. 1991). To succeed on a claim of race discrimination, plaintiff can either provide direct evidence of discrimination or follow the burden-shifting framework that the

Supreme Court established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1192 (10th Cir. 2012).   Under the <u>McDonnell Douglas</u> framework, plaintiff has the initial burden of establishing a prima facie case of discrimination.  <u>Id.</u> Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>Id.</u>  If defendant does so, plaintiff must show that defendant's reason was pretextual.  <u>Id.</u>

 A. <u>Prima Facie Case</u>

 To establish a prima facie case for a disparate treatment claim, plaintiff must show that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination.  <u>Luster v. Vilsack</u>, 667 F.3d 1089, 1095 (10th Cir. 2011).  Defendant concedes that plaintiff is a member of a protected class.  Defendant argues that plaintiff has not established that (1) he suffered an adverse employment action and (2) the alleged adverse action occurred under circumstances giving rise to an inference of discrimination.

 **1. <u>Adverse Employment Action</u>**

 Defendant argues that as a matter of law, plaintiff has not established that the investigation into his residency status qualified as an adverse employment action.  Defendant relies on Tenth Circuit case law stating that "generally" an employment investigation into potential misconduct does not constitute adverse employment action.  Plaintiff argues that due to the investigation's length, intensity and extensiveness, he suffered adverse employment action.  Specifically, plaintiff notes that BPU ordered surveillance on him before asking for documentation to support his residency in Wyandotte County.  Then, in November of 2019, after he provided BPU multiple documents showing that he resided in Wyandotte County, BPU subjected him to another round of

surveillance and did not conclude his investigation until September of 2020, nearly ten months later.  Plaintiff argues that as Torrez continued to unnecessarily "investigate," she "pretty much held plaintiff's job over his head," which qualifies as an adverse employment action.

The Tenth Circuit liberally construes the phrase "adverse employment action."  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).  "Such actions are not limited to monetary losses in the form of wages or benefits," and the action does not need to be "tangible."  Id.; Hillig v. Rumsfeld, 381 F.3d 1028, 1033 (10th Cir. 2004).  Instead, the Tenth Circuit takes a "case-by-case" approach, examining the unique factors relevant to the situation before it.  Sanchez, 164 F.3d at 532.  The Court looks for acts that "carry significant risk of humiliation, damage to reputation and concomitant harm to future employment prospects."  Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004) (internal citations omitted).  The term does not extend, however, to a "mere inconvenience or alteration of job responsibilities."  Sanchez, 164 F.3d at 532.

The Tenth Circuit has never squarely decided whether a workplace investigation is an adverse action, explaining that context matters in making that determination.  Talbott v. Pub. Serv. Co. of N.M., No. CV 18-1102 SCY/LF, 2020 WL 2043481, at *14 (D.N.M. Apr. 28, 2020); see Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty., 587 F.3d 1223, 1238–39 (10th Cir. 2009).[6]  Even so, in the context of this case, plaintiff has raised a genuine issue of material fact

---

[6]     In support of its argument that plaintiff's residency investigation did not qualify as adverse employment action, defendant cites two cases: Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cty., 587 F.3d 1223 (10th Cir. 2009) and Lincoln v. Maketa, 880 F.3d 533 (10th Cir. 2018).  In Couch, a small hospital board investigated plaintiff and another employee after receiving complaints accusing each other of drug misconduct.  Couch, 587 F.3d at 1238–39.  Plaintiff argued that the investigation qualified as adverse action, but the Tenth Circuit disagreed, holding that because the investigation was not directed *solely* at plaintiff and was *reasonable*, it was not an adverse action.  Id. (emphasis added).  In Lincoln, the Tenth Circuit again held that a *standard* workplace investigation generally does not constitute an adverse employment action.  880 F.3d

(continued . . .)

whether the investigation qualified as adverse employment action.  Plaintiff has presented evidence that while BPU may have "reasonably commenced" the investigation, it continued to keep an unnecessary and extensive investigation open.  Plaintiff provided BPU detailed documentation about his residency in Wyandotte County, in line with BPU policy.  After this, plaintiff inquired multiple times about the status of the investigation, to which Torrez and Dumovich did not respond, and the investigation remained open for another ten months.  This investigation cost significantly more than other investigations, potentially damaging plaintiff's reputation and significantly risking humiliation.  Plaintiff felt like "Torrez pretty much held his job over his head" while the investigation continued, becoming more than just an "inconvenience" while BPU reasonably investigated.  Plaintiff has presented facts which create a genuine issue of material fact whether the investigation was adverse employment action.

### 2.  <u>Inference of Discrimination</u>

Defendant argues that plaintiff cannot establish that its investigation occurred under circumstances that give rise to an inference of discrimination.  Specifically, defendant argues that it did not investigate people of protected classes differently than those not in protected classes.  Plaintiff argues that under the circumstances of the investigation, all reasonable inferences from

---

[6] (. . . continued)
at 540 (emphasis added).  The case allegedly involved a sheriff subjecting her subordinate to a criminal investigation at work.  <u>Id.</u> at 535–37.  The Tenth Circuit specifically analyzed the question under the doctrine of qualified immunity, finding that the principle of a criminal investigation qualifying as adverse action was not clearly established.  <u>Id.</u> at 540, 543 (defendants "lacked clear guidance on whether the alleged conduct created an adverse employment action.").  Whether a right is "clearly established" for qualified immunity purposes is different than establishing a prima facie case for a disparate treatment claim.  <u>See</u> <u>Talbott</u>, 2020 WL 2043481, at *14 (finding that <u>Lincoln</u> provided limited guidance to a Title VII discrimination claim because it was decided on qualified immunity grounds).  This case is then distinguishable because (1) it does not involve qualified immunity and (2) it does not involve a *standard* workplace investigation.

the evidence show that BPU discriminated against him.

An inference of discrimination may, but need not, be established by showing that defendant treated plaintiff differently than a similarly situated employee.  Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005) ("such proof is just one sufficient means" to satisfy third prima facie prong).  Articulation of plaintiff's prima facie case may vary depending on "the context of the claim and the nature of the adverse employment action alleged."  Plotke v. White, 405 F.3d 1092, 1100 (10th Cir. 2005).  The question at the heart of a disparate treatment case is whether plaintiff has shown actions taken by the employer from which one can infer that, more likely than not, such actions were based on a discriminatory motive.  Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).  This may be created by showing evidence of "actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus," "statistical data displaying an employer's pattern of discrimination toward a protected class" or the timing of events leading up to an adverse action.  Plotke, 405 F.3d at 1100; see also Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1114 (10th Cir. 2007).

Plaintiff has shown that BPU extended the investigation under circumstances that give rise to an inference of discrimination.  Before initiating surveillance of plaintiff, Torrez never contacted him to get documentation of his residency in Wyandotte County.  Though the policy does not require this step, it explicitly states that documentation is important to determine an employee's residency.  At Torrez's request, plaintiff promptly supplied his documentation.  During the investigation, Torrez stated that she did not find plaintiff's evidence to be credible or reliable, she called plaintiff's property "a shack," which arguably was a "stereotypical comment" and she contributed to a contentious meeting between herself, plaintiff and Dumovich.  She issued a report to Dumovich not long after these events stating her belief that plaintiff was violating the residency

requirement.  Over the next few months, plaintiff contacted Torrez about the status of his investigation more than once, to which Torrez never responded.  Furthermore, four months later, without talking to plaintiff, Torrez contacted Baker again to surveil plaintiff.

Though Dumovich disagreed with Torrez's recommendation and ultimately ended the investigation, this fact is not dispositive.  The Tenth Circuit has endorsed a "subordinate bias theory of liability," under which a racially biased investigator may issue reports and recommendations that cause a decisionmaker who relies on those reports to make a discriminatory employment decision.  Bowdish v. Fed. Exp. Corp., 699 F. Supp. 2d 1306, 1319 (W.D. Okla. 2010) (citing E.E.O.C. v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 487 (10th Cir. 2006)).  Plaintiff has identified sufficient facts and evidence to permit a reasonable inference that Torrez controlled the investigation, decided when and how long to conduct surveillance and supplied critical information to Dumovich contributing to the extension and intensity of the investigation.  Such evidence permits a reasonable inference of a racially motivated investigation based on Torrez's comments reflecting discriminatory animus, her failure to communicate with plaintiff about his investigation status and the fact that out of the 26 people investigated, BPU disproportionately investigated people of color—57 per cent.  Specifically, 37 per cent of those investigated are African American, compared to the 22 per cent of Wyandotte County residents that are African American.  See Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981) (plaintiff's burden establishing disparate treatment prima facie case not onerous).

B.  Pretext

If plaintiff establishes a prima facie case of disparate treatment under McDonnell Douglas, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its adverse employment action.  Defendant has provided a legitimate, non-discriminatory reason for the

investigation—it investigates every complaint alleging a residency requirement violation. Defendant also supplied evidence that BPU extended the investigation because it did not want to make any decisions before the independent investigation into Torrez's conduct concluded. Because defendant has met its burden, the presumption of discrimination drops from the case and plaintiff must establish by a preponderance of the evidence that the proffered reasons were not the true reasons for continuing the investigation. Aramburu v. Boeing Co., 112 F.3d 1389, 1403 (10th Cir. 1997).

Plaintiff may show pretext by establishing that a discriminatory reason more likely motivated defendant or that its stated reasons are unworthy of credence. Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007). While "[t]his burden is not onerous . . . it is also not empty or perfunctory." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323–24 (10th Cir. 1997) (quotation marks and citation omitted). Plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse action is false, i.e., unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company policy when making the adverse employment decision. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). More specifically, evidence of pretext may include the following: "prior treatment of plaintiff; the employer's policy and practice regarding

minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." <u>Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs.</u>, 165 F.3d 1321, 1328 (10th Cir. 1999).

Plaintiff asserts that defendant's stated reasons for prolonging his residency investigation are a pretext for race discrimination.  Specifically, plaintiff has presented evidence that (1) this investigation started immediately with surveillance instead of asking plaintiff for his residency documentation, which the policy explicitly states is a test for determining residency, (2) this investigation cost significantly more than any other residency investigation, (3) after he provided multiple pieces of documentation showing that he resided at the Kimball property in Wyandotte County, he did not receive any communication from BPU or Human Resources for another five months and after another round of surveillance, (4) BPU's statistical data shows that it investigates people of color, specifically African Americans, at a disproportionate rate, (5) Torrez, the person investigating him, voluntarily left BPU because she violated the residency requirement and (6) even after concluding Torrez's investigation, BPU took another two months before closing plaintiff's investigation.

Defendant argues that plaintiff cannot eliminate non-discriminatory reasons for the investigation because BPU needed to investigate Torrez's conduct before rendering a decision about his residency.  <u>See</u> <u>Timmerman</u>, 483 F.3d at 1121 (to show pretext based on differential treatment, plaintiff must rule out non-discriminatory reasons).  Statistics are refutable and depend on the surrounding circumstances.  <u>Int'l Bhd. Of Teamsters v. United States</u>, 431 U.S. 324, 340 (1977).  The statistical data must show a significant disparity and eliminate non-discriminatory reasons for this disparity.  <u>Fallis v. Kerr-McGee Corp.</u>, 944 F.2d 743, 746 (10th Cir. 1991); <u>see</u> <u>McDonnell Douglas</u>, 411 U.S. at 805 (statistics showing prolonged and marked imbalance may

not be controlling in individual discrimination case where legitimate reason for employer's action is present).

Torrez's ability to investigate was subjective and discretionary. Torrez decided how long investigations should last; what, if any, surveillance should occur during the investigation; and at what point the employee should know that BPU is investigating him. She significantly influenced the Director of Human Resource's decision as she stated what evidence was reliable and recommended whether the employee violated the residency requirement. Torrez's reports and recommendations had the power to influence Dumovich to make a discriminatory employment decision regarding plaintiff's residency investigation. See Bowdish, 699 F. Supp. 2d at 1319. Since 2015, BPU only surveilled seven out of twenty-six people, and its investigations of African Americans are higher than the percentage of Wyandotte County residents that are African American (37 per cent compared to 22 per cent). See Fallis, 944 F.2d at 746 (statistical data showing employer's pattern of conduct toward protected class can create inference that employer discriminated against individual members of class). Defendant has not refuted or cited any facts that the ethnic composition of BPU is different than in Wyandotte County as a whole.

Viewing all the evidence in a light most favorable to plaintiff, a reasonable jury could find that defendant's stated reasons for investigating plaintiff were pretext for discrimination. The Court therefore overrules defendant's motion for summary judgment on plaintiff's race discrimination claim.

## II.     Retaliation Under Section 1981

Plaintiff asserts that BPU retaliated against him after he complained of discrimination on November 1, 2019, and again on April 9, 2020. Specifically, plaintiff alleges that he supplied BPU extensive documentation proving that he resided in Wyandotte County. In this documentation, he

included a letter explaining how Torrez discriminated against him.  He argues that instead of looking at his documentation and ending the investigation, BPU retaliated against him by continuing to keep the investigation open for another ten months.  Defendant argues that it is entitled to summary judgment because (1) plaintiff has not established a prima facie case of retaliation and (2) defendant had a legitimate, non-retaliatory reason for continuing to investigate plaintiff's residency.

To succeed on a retaliation claim, plaintiff must show that defendant retaliated against him for engaging in protected activity.  Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 (10th Cir. 2015).  To do so, plaintiff can either provide direct evidence of retaliation or follow the McDonnell Douglas framework described above.  See id.  To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected activity, (2) he suffered a material adverse action and (3) a causal connection exists between the protected activity and the adverse action.  Id. Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Id.  If defendant does so, plaintiff must show that defendant's reason was pretextual.  Id.

A.  Prima Facie Case

Defendant does not dispute that plaintiff engaged in protected activity on April 17, 2020. Defendant argues that plaintiff has not established that (1) his letter to BPU on November 11, 2019 qualified as protected activity, (2) he suffered a material adverse action and (3) a causal connection existed between the protected activity and the alleged adverse action.  The Court analyzes whether plaintiff has established each element of a prima facie case.

1.  **Protected Activity**

Defendant argues that plaintiff's letter on November 11, 2019, is at most asserting personal

grievances and is not protected activity.  Plaintiff argues that he engaged in protected activity on November 11, 2019 when he wrote a letter to BPU about the meeting on November 4, 2019. Plaintiff's letter described his Wyandotte County documentation and explained his association with the Stillwell property.  His letter also stated that "Ms. Tammy Torrez stated that she found it hard to believe that I chose to live in the 'shack' on Kimball Ave."  He ended the letter by saying, "After more than 45 minutes of answering questions, providing explanations, offering proof, and enduring Human Resource professional, Tammy Torrez's derogatory comment and biases [sic] opinion, I left our November 4th meeting feeling not only offended but also targeted and misunderstood.  A comment of this nature received from a coworker or management staff is something I would have spoken to HR about."

Plaintiff must establish that he engaged in protected opposition to discrimination.  Plaintiff generally need not file a written complaint to qualify as protected opposing activity, but the remarks must sufficiently convey concerns about the unlawfulness of an employer's conduct. Malik v. Amini's Billiard & Bar Stools, Inc., 454 F. Supp. 2d 1106, 1117 (D. Kan. 2006).  Further, plaintiff's alleged protected activity generally must oppose illegal discrimination to management or supervisory officials and must not merely take the form of personal complaints or grievances. Id.  (citing Wirtz v. Kan. Farm Bureau Servs., Inc., 274 F. Supp. 2d 1198, 1212 (D. Kan. 2003)). No magic words are required to qualify as protected opposition, but the employee must convey to the employer "the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner."  Id.  (quoting Garcia-Paz v. Swift Textiles, Inc., 873 F. Supp. 547, 560 (D. Kan. 1995)).

On this record, plaintiff's remarks sufficiently conveyed concerns that he felt discriminated against based on Torrez's comment.  See Crawford v. Metro. Gov't of Nashville & Davidson Cty.,

Tenn., 555 U.S. 271, 276 (2009) ("When an employee communicates to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity.").  Plaintiff's letter goes beyond "general complaints about company management and one's own negative performance evaluation."   Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1203 (10th Cir. 2008). Recognizing that "employees often do not speak with the clarity or precision of lawyers," plaintiff's letter concerning Torrez's actions and comments, as well as stating that this would be the kind of thing to contact Human Resources about, can be understood to show them to be more than offhand or personal comments that no reasonable person in the workplace would believe to be unlawful discrimination.  See Womack v. Del. Highlands Al Servs. Provider, LLC, 883 F. Supp. 2d 1013, 1023 (D. Kan. 2012).  Defendant is therefore not entitled to summary judgment on this issue.

### 2.  Material Adverse Action

Defendant incorporates its arguments above to argue that plaintiff did not sustain any adverse employment actions under Section 1981.  Plaintiff also renews its arguments above, arguing that he suffered adverse employment action due to the investigations' length, intensity and extensiveness.

In Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006), the Supreme Court broadened the definition of "material adverse action" for retaliation claims compared to disparate treatment claims.  Id.  For an employer's action to be adverse on a retaliation claim, it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   Id.   The Tenth Circuit examines this through a "case-by-case approach," examining the unique factors relevant to the situation because "context matters."  Id.; Sanchez,

164 F.3d at 532.  "Petty slights, minor annoyances, and simple lack of good manners" are not enough to deter a reasonable worker from making or supporting a charge of discrimination. McGowan v. City of Eufala, 472 F.3d 736, 742 (10th Cir. 2006).

Plaintiff has presented evidence that he provided BPU detailed documentation about his residency in Wyandotte County, in line with BPU policy.  When plaintiff provided this documentation, he also submitted a letter to BPU saying that he had to endure Torrez's "derogatory comment and biases [sic] opinion," which would be something he "would have spoken to HR about."  Plaintiff then presented evidence that after this, BPU continued to keep an unnecessary and extensive investigation open.  This investigation cost significantly more than other investigations, potentially damaging plaintiff's reputation and significantly risking humiliation. Plaintiff inquired multiple times about the status of the investigation, to which Torrez and Dumovich did not respond, and the investigation remained open for another ten months.  Plaintiff has presented facts which create a genuine issue of material fact whether the act of keeping the investigation open unnecessarily qualified as more than a petty slight or a minor annoyance and would deter a reasonable worker from making or supporting a charge of discrimination.  See id. Defendant is therefore not entitled to summary judgment on this issue.

### 3.  Causal Connection

Defendant argues that even if plaintiff's letter to BPU on November 11, 2019 qualifies as protected activity, he cannot demonstrate a causal connection between the letter and the alleged adverse employment action.  Defendant argues that any alleged adverse action occurred over four months after plaintiff wrote the letter on November 11, 2019.  Plaintiff argues that defendant's "temporal proximity" argument fails because it was the act of continuing the investigation that was the adverse action, not merely waiting four months to start surveillance again or ten months to

close the investigation.

To establish a sufficient causal connection, plaintiff must show that a desire to retaliate against his protected activity motivated defendant to commit the challenged conduct.  See Hinds, 523 F.3d at 1202–03.  Protected conduct very closely followed by an adverse action may justify an inference of retaliatory motive.  Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996). For example, the Tenth Circuit has held that a six-week period between the adverse action and protected activity is close enough in time to establish causation, but that a three-month period is not.  See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

Plaintiff has presented evidence that on November 11, 2019, plaintiff engaged in protected activity and put defendant on notice that unlawful discrimination was taking place.   On December 5, 2019, less than a month later, Torrez wrote a memorandum to Dumovich explaining her belief that plaintiff's residency evidence was falsified and unreliable.  She concluded by saying that sufficient evidence supported the conclusion that plaintiff was violating the residency requirement.  However, no one communicated with plaintiff, despite his attempts to receive status updates, and the investigation continued.  Furthermore, Torrez waited almost four months before re-initiating surveillance of plaintiff.  Accordingly, plaintiff has presented evidence which creates an inference of a causal connection between the continuation of his investigation, Torrez's report and his letter written on November 11, 2019.  See id. (adverse action occurring within six weeks of protected activity alone sufficient to establish causation).

B.  Pretext

As noted above, defendant states that it had a legitimate, non-retaliatory reason for initially investigating plaintiff and extending the investigation.  Once defendant proffers legitimate, non-retaliatory reasons for its actions, the burden shifts back to plaintiff to show that defendant's

reasons are merely pretexts for retaliation.  <u>Foster v. Mtn. Coal Co., LLC</u>, 830 F.3d 1178, 1186 (10th Cir. 2016).  At this final stage of the <u>McDonnell Douglas</u> framework, the presumption of retaliation created by plaintiff's prima facie case "simply drops out of the picture." <u>Swackhammer</u>, 493 F.3d at 1167 (internal quotation omitted).  Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." <u>Id.</u>

Defendant states that it continued plaintiff's investigation to properly investigate Torrez's misconduct allegations.  Plaintiff's response does not mention pretext.  Even so, plaintiff has presented evidence that (1) BPU planned to continue the investigation before it began to investigate Torrez's misconduct, (2) after the letter on November 11, 2019, Torrez stopped communicating with plaintiff about his investigation, despite his numerous attempts to receive updates, (3) Torrez concluded that plaintiff violated the residency requirement less than a month after writing this letter and (4) even after concluding Torrez's investigation, BPU took another two months before closing plaintiff's investigation and finding no violation took place.  This evidence, along with plaintiff's causation evidence, raises a genuine issue of material fact whether defendant's stated reason for continuing the investigation was a pretext for retaliation.  Defendant is not entitled to summary judgment on this claim.

## III.    Hostile Working Environment In Violation Of Section 1981

As with his race discrimination claim, plaintiff asserts that defendant subjected him to a racially hostile work environment by conducting a lengthy and unnecessary investigation into his residency.  Defendant argues that it is entitled to summary judgment because plaintiff cannot

establish a prima facie case.

The same substantive standards apply to hostile work environment claims whether brought under Section 1981 or Title VII.  Payan v. United Parcel Serv., 905 F.3d 1162, 1170 (10th Cir. 2018).  To establish a prima facie case of hostile work environment, plaintiff must demonstrate that based on the totality of circumstances, (1) he is a member of a protected group, (2) he was subject to unwelcome harassment, (3) the harassment was based on race and (4) the harassment was pervasive or severe enough to alter the terms, conditions or privilege of employment and created an abusive work environment.  Lounds v. Lincare, Inc., 812 F.3d 1208, 1222 (10th Cir. 2015) (citations omitted).  In determining whether an environment is sufficiently hostile to be actionable, courts look at the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with an employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998) (internal quotations and citations omitted).

Defendant does not dispute that plaintiff is a member of a protected class.  Defendant argues that it is entitled to summary judgment because plaintiff cannot show that (1) he was subjected to unwelcome harassment, (2) the alleged harassment was based on race or (3) the alleged harassment was pervasive or severe enough to alter a term, condition or privilege of his employment and create an abusive work environment.

A.  Whether BPU Subjected Plaintiff To Unwelcome Harassment

Defendant argues that as a matter of law, plaintiff has not shown that the residency investigation was harassment, as the requirement applies uniformly to all employees.  Plaintiff incorporates the same arguments from his race discrimination claim to argue that he suffered unwelcome harassment.  Specifically, plaintiff cites the fact that in November of 2019, he provided

BPU multiple documents showing that he resided in Wyandotte County: his driver's license, voter registration, motor vehicle registrations, bank account information, a draft separation agreement between him and his wife, reports of break-ins at the Kimball property, security camera photos of him coming and going from the Kimball property and his home's electronic door lock data. However, before asking for documentation, BPU surveilled plaintiff 11 times.  Rather than assessing the documentation and ending the investigation shortly after that, BPU then subjected plaintiff to another round of surveillance and did not conclude the investigation until September of 2020, nearly ten months later.  Plaintiff argues that the length, intensity and extensiveness of the investigation qualified as unwelcome harassment.

To constitute harassment, the conduct must be unwelcomed in the sense that the employee "did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."  Morton v. Steven Ford-Mercury of Augusta, Inc., 162 F. Supp. 2d 1228, 1238 (D. Kan. 2001).  When plaintiff learned of the investigation, he supplied documentation that BPU explicitly stated would help determine whether an employee's "legal primary residence" was in Wyandotte County.  After plaintiff produced the documents, BPU and Human Resources did not update plaintiff about his investigation status for over five months.  Even after meeting with plaintiff in April of 2020 and asking for more supporting documents, BPU did not close the investigation for another five months.  Plaintiff expressed to BPU that these meetings and the lack of communication left him feeling targeted, bullied and misunderstood.  Dumovich testified that in comparison to this investigation and surveillance, other investigations were "a much more simple deal."  Viewed in a light most favorable to plaintiff, a reasonable jury could find that BPU's

conduct qualified as unwelcome harassment.

      B.  <u>Whether The Harassment Was Based On Race</u>

Defendant also argues that plaintiff cannot establish that the alleged harassment was based on race because BPU launched the investigation solely based on where plaintiff lived at the time. Plaintiff argues that Torrez's comments about plaintiff's house, the extreme length of the investigation and the disproportionate number of residency investigations BPU launches against people of color show that the harassment was clearly based on race. Plaintiff cites Torrez calling his house a "shack" and that of the 26 people BPU investigated, more than half were people of color. Specifically, 37 per cent of those investigated are African American.

Plaintiff has raised a genuine issue of material fact whether defendant subjected him to a hostile work environment that was based on race or racial animus. Plaintiff cites demographic data that shows that BPU investigated African American employees disproportionately to Caucasian employees. Defendant cites no facts to refute that BPU's ethnic composition differs from Wyandotte County as a whole. As a member of a protected class subject to a disproportionate level of inquiry regarding his residency status, plaintiff raises a genuine issue of material fact whether defendant subjected him to a hostile work environment based on race or racial animus.

      C.  <u>Whether The Harassment Was Pervasive And Severe Enough To Create An Abusive Working Environment</u>

 Defendant also seeks summary judgment on the ground that plaintiff has not shown harassment pervasive and severe enough to alter the terms of his employment and create an abusive working environment. Plaintiff argues that under the totality of the circumstances, the lengthy and extensive investigation qualified as conduct severe and pervasive enough to create an abusive

working environment.

To survive summary judgment, plaintiff must show that a rational jury could find that his workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive enough to alter the conditions of his employment and create an abusive working environment.  Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998). A discriminatorily abusive environment will often "detract from an employee's job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).   The work environment must be subjectively and objectively hostile and abusive.   Lounds, 812 F.3d at 1222.   The Court must consider not only the effect the discriminatory conduct had on plaintiff but also the impact it likely would have on a reasonable employee in plaintiff's position.   Hurde v. Jobs Plus-Med, 299 F. Supp. 2d 1196, 1211 (D. Kan. 2004).  The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is "quintessentially a question of fact," and there are no sharply defined rules.   Harris, 510 U.S. at 21–22; McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir. 2001).

Defendant concedes that plaintiff testified that he was subjectively offended by the investigation but argues that the work environment was not objectively hostile or abusive. Defendant relies on the fact that plaintiff's investigation only required him to attend two meetings with Dumovich and Torrez and that an "investigator conducted two instances of surveillance." Plaintiff refutes defendant's characterization of the investigation and argues that the Court must look at the totality of the circumstances rather than the individual acts.

Before plaintiff learned of the investigation, BPU's investigator conducted surveillance of plaintiff 11 times in less than a month.  Out of the 26 employees investigated, plaintiff was only

one of seven that BPU chose to surveil.  Two months later, after BPU informed plaintiff of the investigation, he promptly provided BPU with supporting documentation.  Over the next ten months, plaintiff knew BPU had an open investigation, but he did not receive answers about the status of the investigation or when it would conclude.  Plaintiff felt threatened that "Torrez pretty much held his job over his head" while he waited.  Aside from the uncertainty of waiting for answers about the investigation, without any ability to contribute, plaintiff attended meetings with Torrez where she used "offensive" and "contentious" language.  The Director of Human Resources attended these meetings and, instead of intervening, requested that an off-duty police officer attend the next meeting, further contributing to plaintiff's discomfort.  Furthermore, though unclear how long investigations typically last from the record, Dumovich testified that this investigation was the most expensive one that he could recall—this indicates how extensive this investigation was to other investigations.

Looking objectively at the evidence, plaintiff has shown that this conduct would likely impact a reasonable employee's job performance or discourage the employee from remaining on the job.  See Harris, 510 U.S. at 21.  Viewing the evidence in the context of the statistical evidence showing that BPU subjected people of color, specifically African Americans, to a disproportionate amount of residency investigations (57 per cent and 37 per cent, respectively), plaintiff has created a genuine issue of material fact whether the racial hostility was pervasive or severe enough to alter the terms of his employment and create an abusive working environment.  See Lounds, 812 F.3d at 1224 (facially neutral abusive conduct can support finding discriminatory animus sufficient to sustain hostile work environment claim when viewed in context of other discriminatory conduct).  This extensive investigation occurred over 14 months.  Plaintiff attempted to receive answers about the investigation to no avail for ten months, which a reasonable employee in plaintiff's position

could view as pervasive or severe.  Meanwhile, plaintiff was also observing a general pattern of disparate treatment toward his fellow African American employees, as evidenced by the statistical data.  While it may be a close call, plaintiff has presented evidence which creates a genuine issue of material fact whether his workplace was an abusive working environment that was sufficiently severe or pervasive to alter the conditions of his employment.  See McCowan, 273 F.3d at 923. Accordingly, defendant is not entitled to summary judgment on plaintiff's hostile work environment claim.

**IT IS THEREFORE ORDERED** that Defendant Kansas City Board of Public Utilities' Motion For Summary Judgment (Doc. #51) filed February 22, 2022 is **OVERRULED.**

Dated this 14th day of June, 2022 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge